# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DOROTHY AGAR, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 9541-VCL |
| | ) | |
| MICHAEL JUDY, *et al.*, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Date Submitted: November 17, 2016
Date Decided: January 19, 2017

Evan O. Williford, Andrew Huber, THE WILLIFORD LAW FIRM LLC, Wilmington, Delaware; *Counsel for Edward Trujillo, Rachel Coughlin, Ted Kampen, James Solic, Joseph Washington, and the Preferred Investors Association*

Catherine A. Gaul, F. Troupe Mickler, ASHBY & GEDDES, Wilmington, Delaware; *Counsel for Roman Kitka and J. Barclay Knapp.*

Sean T. Kelly, Ryan M. Ernst, George Pazuniak, O'KELLY ERNST & BIELLI, LLC, Wilmington, Delaware; *Counsel for Carole Downs*.

**LASTER, Vice Chancellor.**

On June 22, 2015, Preferred Communications Systems, Inc. ("PCSI" or the "Company") held an annual meeting of stockholders. The Preferred Investors Association (the "Association") opposed the reelection of the incumbent members of the Company's board of directors. In advance of the annual meeting, five members of the Association signed a letter that the Association distributed to the Company's investors (the "Fight Letter"). Three of the incumbent directors lost their seats.

The former directors brought a claim for defamation against the Association and the members who signed the Fight Letter. Their lawsuit has been consolidated with a plenary proceeding that involves a variety of claims and counterclaims in which various parties appear in multiple capacities. This decision addresses the defamation claim. It refers to the former directors as the "Libel Plaintiffs." It refers to the Association and the five signatories as the "Libel Defendants."

The Libel Defendants have moved to dismiss the defamation claim pursuant to Rule 12(b)(6) for failure to state a claim on which relief can be granted. They argue that the claim constitutes a Strategic Lawsuit Against Public Participation (a "SLAPP") within the meaning of Delaware's anti-SLAPP statute. 10 *Del. C.* §§ 8136-8138. The anti-SLAPP statute imposes additional burdens on a plaintiff who pursues a SLAPP at each stage of the litigation process, including a more onerous standard for surviving a motion to dismiss. This decision concludes that anti-SLAPP statute does not apply.

The Libel Defendants separately argue that the Libel Plaintiffs are limited-purpose public figures. If they are, then the Libel Plaintiffs bear the burden of proving

that the statements in the Fight Letter were not true and were made with actual malice. This decision holds that the Libel Plaintiffs are limited-purpose public figures.

The Libel Defendants finally argue that based on the allegations in the complaint, it is not reasonably conceivable that the statements in the Fight Letter were defamatory and, to the extent they could be, were made with actual malice. This decision finds it reasonably conceivable that a subset of the statements was defamatory and made with actual malice. The motion to dismiss is denied as to these statements. Otherwise it is granted.

## I.     FACTUAL BACKGROUND

The facts are drawn from the Amended and Supplemental Complaint (the "Complaint") and the documents it incorporates by reference. For purposes of the motion to dismiss, the well-pled allegations of the Complaint are assumed to be true, and the Libel Plaintiffs receive the benefit of all reasonable inferences. This decision takes judicial notice of previous proceedings in related actions, including *Judy v. Preferred Communication Systems Inc.*, Consol. C.A. No. 4662-VCL (the "Judy Litigation"). This decision also takes judicial notice of matters of public record. See D.R.E. 201(b).

### A.     The Company's Origins

The Company was formed in 1998 as the vehicle for a scheme in which Pendleton Waugh, Charles Austin, Jay Bishop, and Charles Guskey planned to assemble a critical mass of specialized mobile radio licenses, then flip them to another company where Waugh was president. Because of how the Federal Communications Commission (the "FCC") historically distributed rights to wireless spectrum, the licenses were held by

2

individuals having varying degrees of sophistication. *Judy v. Preferred Comm'cn Sys. Inc.*, 2016 WL 4992687, at \*2 (Del. Ch. Sep. 20, 2016).

Waugh and Bishop were convicted felons. Both had pled guilty to crimes involving fraud or dishonesty based on their activities in the cellular telephone industry. Austin previously worked to acquire licenses for one of Waugh's companies. Evidencing his own regard for legal compliance, Austin never bothered to file a state or federal income tax return between 1997 and 2010. Guskey had worked as one of Bishop's accountants at Continental Wireless Cable Television, Inc. ("Continental"), another company that acquired wireless licenses. In 1994, the SEC filed an enforcement action against Continental for defrauding investors, obtained a restraining order against Continental, seized its assets, and froze the bank accounts of the company and its principals.[1]

Austin served as the front man for the Company. In the Judy Litigation, after trial, this court made the following finding of fact:

> [B]ecause Bishop and Waugh were convicted felons, and because the FCC looks askance at felons and fraudsters controlling (directly or indirectly) cellular communications licenses, Waugh, Bishop, Guskey, and Austin sought to conceal Waugh and Bishop's involvement. To that end, Austin always acted as the front man for the group, and Waugh and Bishop never held any official positions with PCSI. Despite foregoing any official roles, Waugh and Bishop in fact acted as principals of PCSI, participated in its operations, and made decisions on behalf of PCSI.

---

[1] See Press Release, Securities and Exchange Commission, Continental Wireless Cable Television, Inc. (May 21, 2002), *available at* http://sec.gov/divisions/enforce/claims/contwire.htm.

Judy Litigation, Dkt. 432, ¶ 4.

**B.     The Company's Strategy Changes.**

Beginning in 1998, the Company assembled a group of licenses in Puerto Rico and the U.S. Virgin Islands. The Company largely acquired them from individuals in return for packages of consideration that typically included securities in the Company. The Company also obtained a set of licenses predominantly clustered in Virginia and California. *Judy,* 2016 WL 4992687, at *3.

In 1999, the plan to flip the licenses foundered after Waugh encountered further legal difficulties. The FCC described them as follows:

> In 1999, Waugh was convicted of securities fraud, a felony, in a case brought by the State of Texas, arising from his failure, in 1993, to disclose to a potential investor that he was under investigation by federal authorities for activities relating to his involvement in Express. Waugh was sentenced to four years in state prison, all of which were suspended pending successful completion of probation. He also was ordered to pay $72,000 in restitution and to complete 500 hours of community service.
>
> Later in 1999, Waugh was determined to have violated the terms of his parole from federal prison and his probation on his state conviction by traveling to Puerto Rico to engage in activities relating to cellular telephone securities. As a result, Waugh was sentenced to six additional months in federal prison and four years in state prison.[2]

With the assemble-and-flip strategy no longer viable, the four founders pivoted towards the more challenging task of turning the Company into a full-service wireless telecommunications provider.

---

[2] *Pendleton C. Waugh*, 22 F.C.C.R. 13363, 13365-66 (2007); *see* Judgment for Revocation of Probation, *Waugh*, No. 3:94-CR-160-T; *Texas v. Waugh*, No. F-9703517 (Crim. Dist. Ct. Dallas, Tex., May 17, 1999).

4

Ostensibly to fund this plan, the Company raised money from outside investors by issuing a variety of poorly documented securities. In the Judy Litigation, this court made the following finding of fact after trial:

> To use a technical corporate term, [the Company] was a mess. Its founders did not follow corporate formalities and took dramatically different positions regarding the [C]ompany's capital structure depending on whether they were dealing with regulatory authorities like the FCC, potential investors, or the Court. It is not possible to reconcile all of the conflicting evidence into a single coherent account, nor is it possible to harmonize all of the various transactions in which [the Company] engaged or the types of securities that ostensibly were issued.

Judy Litigation, Dkt. 433, ¶ 5.

It is not clear what progress, if any, the Company made during this period toward becoming a full-service wireless telecommunications provider. Its primary business activity appears to have been inducing individuals to buy its securities.

## C.    The Order To Show Cause

In July 2007, after conducting a preliminary investigation, the FCC issued an Order to Show Cause to Waugh, Austin, Bishop, the Company, and the Company's wholly-owned subsidiary that owned the licenses. The FCC summarized its reasoning as follows:

> The record before us indicates that these individuals, two of whom are convicted felons, and the referenced entities, individually and collectively, among other things, apparently (1) failed to disclose a real-party-in-interest and engaged in unauthorized transfers of control of Commission licenses; (2) misrepresented material facts to the Commission; (3) lacked candor in their dealings with the Commission; (4) failed to disclose the involvement of convicted felons in ownership and control of the licenses; (5) failed to file required forms and information and respond fully to Enforcement Bureau letters of inquiry; and (6) discontinued operation of certain licenses. Evidence of such misconduct raises material and substantial questions

5

requiring further inquiry at hearing as to whether the referenced licenses should be revoked and whether forfeitures should issue against one or more of the persons and/or entities identified above.

*Waugh*, 22 F.C.C.R. at 13364.

The Order to Show Cause posed an existential threat to the Company. If the FCC revoked the licenses, then the Company no longer would have any valuable assets.

By late 2007, the Order to Show Cause had driven "a wedge between Waugh and Austin." Judy Litigation, Dkt. 432, ¶ 4. Before the enforcement proceeding, Waugh was "the principal decision-maker for [the Company], with Austin acting as a figurehead." *Id.* Afterwards, Austin tried to distance the Company from Waugh. Austin could do this because the certificate of incorporation identified Austin as the sole director of PCSI. Shortly after the Company was formed, acting as sole director, Austin appointed himself CEO and President. The Company had never held a meeting of stockholders, so Austin continued in those roles. From a technical legal standpoint, Austin was in charge. *Judy,* 2016 WL 4992687, at *5.

## D.    Waugh Forms Smartcomm, The Association, And PSI.

Waugh wanted to regain control of the Company. In furtherance of this goal, he formed a series of entities. To minimize the appearance of his own involvement, he nominally put others in charge. *Id.*

In December 2007, Waugh formed Smartcomm, LLC with Carole Downs (one of the Libel Plaintiffs). They met in June 2007 through Match.com. Downs was a successful real estate broker in Arizona. She had no experience in the wireless industry and knew nothing about it. Despite her lack of experience, Downs became President of

6

Smartcomm. Waugh served as Vice President. Smartcomm became the new vehicle through which Waugh pursued his activities in the wireless industry. *Id.*

Waugh and Downs worked to organize the various investors who had purchased securities from the Company. Their strategy was to blame Austin for the Company's lack of progress, then use the investors' anger as the vector for regaining control. *Id.*

Their first investors' organization was the Association. Waugh recruited Michael Judy to serve as its public persona. In 1999, Judy became an investor in the Company after meeting with Waugh and attending a subsequent investor presentation. Waugh and his team convinced Judy about the Company's fantastic prospects, and Judy agreed to make a personally significant investment of $40,000, which he raised by maxing out his credit cards and borrowing from his father. Judy was not an expert in the wireless industry; his primary avocation was professional auto racing. His role was that of a passive investor until early 2007, when he became a finder for the Company and was compensated for bringing in other investors. Waugh convinced Judy that Austin was the source of the Company's problems. *Id.* at *6.

In November 2008, Judy, Waugh, and other investors agreed to form the Association, and they elected Judy as President. But Judy's tenure as head of the Association and its role as a vehicle for Waugh were both short-lived. Disagreements quickly arose between Waugh's faction and investors associated with Edward Trujillo (one of the Libel Defendants). Trujillo had served as a finder for the Company and brought in many of the individuals who purchased its securities. Judy resigned, and Trujillo became President. The Association eventually came to represent approximately

eighty investors who collectively provided approximately $3.1 million in funding to the Company. Trujillo and the Association came to be the principal opponents of Waugh's efforts to regain control over the Company. *Id.*

Having lost control of the Association, Waugh needed to form a new organization. In January 2009, Judy, Waugh, and various supporters decided to form Preferred Spectrum Investments, LLC ("PSI"). In February 2009, Judy formally created PSI and became its President. One of the business purposes of PSI was to gain control over the Company. *Id.*

### E.    The Judy Litigation

PSI funded the Judy Litigation in an effort to retake control of the Company. PSI's strategy was to obtain a court-ordered meeting of stockholders at which Waugh and his allies could replace Austin and establish a new board majority. PSI itself was not a stockholder in the Company, so Judy served as the plaintiff. *Id.*

In June 2009, Judy filed an action for books and records pursuant to Section 220 of the Delaware General Corporate Law (the "DGCL"). *See* 8 *Del. C.* § 220. Among other materials, Judy sought information about the stockholders of the Company and a copy of the Company's stock ledger. *Judy,* 2016 WL 4992687, at *6.

In July 2009, Judy filed an action to compel the Company to hold its annual meeting of stockholders in accordance with Section 211 of the DGCL. *See* 8 *Del. C.* § 211. Since its founding in 1998, the Company had never held an annual meeting. *Judy,* 2016 WL 4992687, at *7.

8

On the same day that he filed the annual meeting action, Judy filed a plenary action that contended, among other things, that Austin had breached his fiduciary duties. The court consolidated the three lawsuits into the proceeding that this decision refers to as the "Judy Litigation." *Id.*

Judy moved for summary judgment on various aspects of his claims. By order dated September 29, 2009, as amended on October 13, the court granted summary judgment in Judy's favor on his claim for books and records. The court also granted summary judgment in favor of Judy on his request for an annual meeting. The order directed the Company hold an annual meeting of stockholders on December 9, and it appointed Richard L. Renck, Esq., to act as special master for purposes of overseeing the annual meeting. *Judy,* 2016 WL 4992687, at *8.

## F.    The Judy Litigation Becomes Significantly More Complex.

After the court's rulings, Waugh and his allies thought they were on their way to a court-ordered meeting in December 2009. But Austin failed to comply with the portion of the order that directed the Company to produce a list of its stockholders. Put simply, the Company's records were such a mess that Austin could not generate the list. *Id.* at *9.

After the Company failed to meet the court-ordered deadline for producing the list, Judy sought the appointment of a receiver who would take control of the Company for the limited purpose of providing it. By order dated December 23, 2009, the court appointed Renck to act as receiver for the Company (the "Receiver"). The order charged the Receiver with identifying the Company's stockholders, determining who could vote at the annual meeting, and then convening and conducting the meeting. *Id.*

9

Also in December 2009, the court permitted the Association to intervene in the Judy Litigation. Trujillo had perceived Waugh's strategy of using a court-ordered meeting to regain control of the Company. He also perceived that Waugh was using Judy as a front man to hide his involvement. *Id.*

## G.    The Receiver's Report

On March 5, 2010, the Receiver filed his report. He made recommendations about the identity and holdings of the Company's stockholders. He also identified serious problems with the Company's capital structure. Several of the recommendations displeased Waugh. Waugh responded by calling upon his allies to file and litigate a host of objections, which they did. *Id.* at *10.

Many of the Receiver's conclusions turned on assessments of incomplete and conflicting corporate records. The ensuing avalanche of objections and claims from Waugh's allies made it clear that a trial would be necessary to resolve the persistent factual disputes. The parties engaged in litigation over the objections in anticipation of a hearing to take place in July 2010, but the process faltered when the Receiver's fees went unpaid. In September 2010, the court confirmed that it would not hold a hearing until the Receiver was paid. Trial eventually was rescheduled for February 2011, then deferred pending mediation. After several more continuances, trial took place in December 2011. *Id.*

After trial, among other things, the court approved a final stock list for the Company. The court directed the Receiver to "schedule a Court-ordered meeting of stockholders for the election of a new board of directors, set the record date for the

meeting, give notice of the meeting, convene and conduct the meeting, and determine those members of the board of directors who have been elected and qualified." *Id.* at \*11.

**H.     The 2013 Annual Meeting**

PSI and the Association each sought to elect candidates to the board at the court-ordered meeting. PSI put forth a slate comprising Judy, Downs, Barclay Knapp, Roman Kikta, and Michael Scott (the "PSI Nominees"). Knapp and Kitka (like Downs) are Libel Plaintiffs. The Association put forth a slate comprising Trujillo, Joseph Washington, Rodney Agar, Rachel Coughlin, and William Callahan (the "Association Nominees"). Coughlin and Washington (like Trujillo) are Libel Defendants.

The election was hotly contested. Both sides sent fight letters to the Company's investors. The Association sent at least two letters; PSI sent at least one. Judy Litigation, Dkt. 453 Exs. A & C; *id.*, Dkt. 459 Ex. D.

The annual meeting was held on January 23, 2013 (the "2013 Meeting"). Out of 172 separate stockholdings appearing on the stock list, 159 voted in person or by proxy. The vote count showed that the PSI Nominees narrowly prevailed.

The Association challenged the outcome. The court overruled the Association's objections, and by order dated March 18, 2013, approved the election of the PSI Nominees. *Judy,* 2016 WL 4992687, at \*11. For simplicity, this decision refers to them post-election as the "PSI Directors."

In April 2013, the PSI Directors began taking action on behalf of the Company. They appointed Knapp as President and CEO and approved a compensation package for

11

him that included a $450,000 salary, an incentive bonus equal to 100% of his salary, and stock options. *Id.*

On December 20, 2013, the Company reached an agreement to sell approximately 70% of its licenses for $60 million to Sprint (the "Sprint Transaction"). In June 2014, the Sprint Transaction closed. After receiving the $60 million in transaction proceeds, the PSI Directors authorized various payments by the Company. They included compensation payments to the directors and a special bonus to Knapp of $315,000. *Id.* at *12.

## I. The Association's Continuing Efforts.

Despite losing the proxy context, the Association did not go away. In April 2014, over forty Company stockholders filed suit in this court against the Company, the PSI Directors, and several of their affiliates (the "Plenary Action"). The plaintiffs largely appear to be members of the Association. The wide-ranging complaint asserted twenty different causes of action.

In November 2014, Trujillo took a page from Judy's book and filed two lawsuits against the Company. The first sought to inspect books and records. *Trujillo v. Preferred Commc'ns Sys., Inc.*, C.A. 10376-VCL (Del. Ch. Nov. 20, 2014) (the "Books and Records Action"). The second sought to compel the Company to hold its annual meeting of stockholders. *Trujillo v. Preferred Commc'ns Sys., Inc.*, C.A. 10378-VCL (Del. Ch. Nov. 20, 2014) (the "Meeting Action"). When Trujillo filed the Meeting Action, the Company had not held an annual meeting since the 2013 Meeting, some twenty-one months earlier. The Company originally opposed both actions.

12

In the Books and Records Action, Trujillo moved for judgment on the pleadings. The court granted the motion in part and required the Company to produce the following categories of documents that the Company previously had indicated it would provide:

a. All final valuations and appraisals of significant assets since January 1, 2013;

b. The most recent financial statements or report as of (i) October 9, 2014; and (ii) the date this order is granted.

c. The [Company's] stocklist; and

d. Financial statements from which the Company's assets and liabilities can be determined.

Books and Records Action, Dkt. 33.

In March 2015, less than two weeks before a scheduled trial in both actions, the parties agreed to a stipulated final order addressing both the Books and Records Action and the Meeting Action (together, the "Final Order"). The Final Order (i) required the Company to produce substantially all the books and records Trujillo had requested, (ii) scheduled the annual meeting for June 22, 2015, and (iii) required the Company to pay costs Trujillo incurred with both actions. *See* Books and Records Action, Dkt. 42.

## J. The Amended Complaint In The Plenary Action

After receiving the documents from the Books and Records Action, the stockholder plaintiffs filed an amended complaint in the Plenary Action. The original complaint had asserted twenty different causes of action; the amended complaint expanded to assert twenty-eight different causes of action.

In substance, the amended complaint alleged that the PSI Directors had "engaged in looting [the Company] to benefit themselves and their affiliates via a number of self-

dealing, wasteful, and/or unapproved transactions." Dkt. 70, at 3. The allegations regarding misuse of Company resources included the following:

- Excessive compensation of $450,000 per year paid to Knapp for serving as CEO, a position to which he devoted only 50% of his time.

- A bonus of $315,000 paid to Knapp for the Sprint Transaction.

- An agreement pursuant to which the Company paid $7,500 per month to a Knapp affiliate in addition to the compensation Knapp was receiving from the Company.

- A $3.5 million payment to Smartcomm License Services, LLC, an affiliate of Downs, to acquire a promissory note from PSI.

- An agreement pursuant to which the Company paid $7,500 per month to a different Downs affiliate.

- Other miscellaneous payments to certain PSI Directors and their affiliates.

- Stock option grants to the PSI Directors.

*See id.* at 15-21.

According to the amended complaint, documents obtained through the Books and Records Action showed that the PSI Directors were projecting that the $60 million received from Sprint Transaction would have dwindled to less than $7 million by the end of 2015. In making this allegation, the amended complaint relied on documents showing that as of March 10, 2015, the Company had approximately $39 million in cash on hand and had identified the following liabilities: (i) taxes payable of approximately $25 million, (ii) amounts due for Company notes and preferred stock redemption obligations of approximately $6.5 million, and (iii) monthly expenses totaling almost $1.35 million.

**K.      The 2015 Annual Meeting**

The Final Order required the Company to hold its annual meeting on June 22, 2015 (the "2015 Meeting"). In advance of the meeting, the Association sent the Fight Letter to a large number of the Company's investors.

Titled "Preferred Investors Association Update April 30, 2015," the Fight Letter urged stockholders not to support the PSI Directors. Compl., Ex. A. It opened by stating:

> It has now been two years since the new Board of Directors was elected and many of you have received reports from the Company . . . giving you only a glimpse of what has transpired in that time. As a reminder, the [Association] was formed in late 2008 by 70 or so investors just like you in [PCSI]. Our mission remains from the beginning to protect our investment and to keep you informed with the facts about the issues facing the Company. In April of 2013, we stated that the new Board cannot be trusted based on how they have conducted themselves in the past, but were also hoping for their success in leading the Company.

*Id.* at 1.

The Fight Letter described the Association's ongoing legal battles with the PSI Directors, including a lawsuit that members of the Association filed in Texas to collect on defaulted promissory notes. After discussing the funds generated by the Sprint Transaction, the Fight Letter summarized its central argument against the PSI Directors:

> Some members of the Board have taken the position that "they" saved the Company and "they" should be rewarded. We now dispel that notion. As you will come to realize, this Board believes it has a right to loot the Company of as much of the $60 million as it can and funnel it to themselves and affiliates through a variety of schemes. In particular, Barclay Knapp and Carole Downs have directed well over $7 million in shares and cash to themselves or affiliates . . . since June of 2014.

*Id.* (bold font omitted).

15

The body of the Fight Letter included a series of statements that accused the PSI Directors of acting to benefit themselves:

- "[T]hey were planning to loot [the Company] without any oversight on your part until it was too late." *Id.*

- "Due to our lawsuits, we have received documents that show in particular Knapp and Downs have engaged in looting the Company. Since June of 2014, Knapp and Downs have siphoned over $7 million in cash and stock to themselves and personal affiliates." *Id.* at 2.

- "Carole Downs is now the leader . . . and is in the process of looting the Company along with Barclay Knapp." *Id.*

- "Knapp and Downs have siphoned over $7 million in cash and stock to themselves and personal affiliates." *Id.*

- "It is in Knapp and Downs' personal interest to drag this out and siphon your money out at their leisure. Knapp and the Directors owe you their fiduciary duty to protect the Company assets but instead they are favoring these other affiliates and themselves." *Id.*

- "It is time to act and stop them from taking your money. We must remove them from their positions before it is too late." *Id.*

This decision refers to these statements as the "Looting Allegations."

The Fight Letter also included statements that accused the PSI Directors of trying to conceal their actions from the Company's investors.

- "[The PSI Directors are] so afraid of you finding out what they are up to that one of the first things they did when they took over was to take away your right to call for a shareholder meeting by eliminating that provision in the Company Bylaws (They even tried to hide this from us until the Court forced them to send us the amended Bylaws)." *Id.* at 1.

- "After an intense battle that lasted into December of 2014, the Company was forced kicking and screaming to settle. This loss shocked them to change their plans and forced them to make payment on all the notes." *Id.*

16

- "Have they disclosed to you that the Court has a restraining order prohibiting them from distributing any funds to preferred and common stock holders [sic] until the lawsuit in Delaware resolves the complaints?" *Id.* at 2.

- "Did they disclose that the Court admonished them that they had to pay the accrued dividends and liquidation preference on preferred stock in liquidation?" *Id.*

- "Did they disclose to you that they were forced by the Court to hold a shareholder meeting on June 22, 2015 (the one they didn't want)?" *Id.*

- "Did they disclose to you that the Court ordered [the PSI Directors] to provide books and records?" *Id.*

This decision refers to these statements as the "Concealment Allegations."

Finally, the Fight Letter included statements that accused the PSI Directors of failing to make payments to its investors.

- "[The PSI Directors] were not going to pay what was owed on the notes. They were not going to pay the accrued dividends on preferred stock. They were not going to pay liquidation preference to outstanding preferred stock. They were not going to pay anything on the GX License claims. They reduced stock owned by individuals that had been approved by the Court." *Id.* at 1.

- "Thanks to those plaintiffs your notes were paid and not because the Company wanted to, and that is the truth." *Id.*

- "Soon, that $60 million [in cash the Company received from the Sprint Transaction] will be down to less than $5 million and [the PSI Directors are] threatening to renege on their promise to you to liquidate and make a distribution to stockholders." *Id.* at 2 (bold font omitted).

This decision refers to these statements as the "Payment Allegations."

The Fight Letter concluded with the following exhortation: "It is time to stop [the PSI Directors] from taking your money. We must remove them from their positions before it is too late." *Id.* The Fight Letter also informed its recipients that if they wanted to "know more or review documents," they could contact the Association's Steering

Committee. The Fight Letter was signed electronically by Trujillo, Coughlin, and Washington, who previously had served as Association nominees in connection with the 2013 Annual Meeting, and by Ted Kampen and James Solic. The Fight Letter identified the five signatories as members of the Association's Steering Committee.

## L.     The Response To The Fight Letter

On May 14, 2015, about two weeks after the Association sent the Fight Letter, the Company and the PSI Directors responded in two ways. First, the PSI Directors filed a complaint in Superior Court against the Libel Defendants that sought damages for libel and injurious falsehood based on statements in the Fight Letter. Second, they sent the Company's investors a responsive letter of their own.

The PSI Directors' offensive lawsuit fit a pattern of similar litigation filed by Waugh, Downs, and Smartcomm. In 2011, Smartcomm brought a claim for defamation against Grant Stousland for calling Smartcomm a "scam" that was "misleading" its investors, who were "suckers." Smartcomm alleged that, as a result of Stousland's comments, one of its representatives, Judy, had lost over $500,000 in client commitments, and that another of its representatives, Bart Caso, lost $5.7 million in client commitments.[3] The complaint was dismissed by stipulation with prejudice in 2013.

---

[3] In 2012, Bart Caso was charged with fraud while raising money for PSI. The Association publicized this fact to shareholders while soliciting proxies for the 2013 Meeting. PSI distanced itself from Caso, saying in a letter to stockholders that "[t]he matter does not involve PSI or Smartcomm." Judy Litigation, Dkt. 452 Ex. D. In challenging the outcome of the 2013 Meeting, the Association argued that this description misrepresented PSI's relationship with Caso. I overruled the objection, noting that while "the [l]etter creates the impression of greater distance between PSI and Caso

18

Stipulation of Dismissal with Prejudice, *Smartcomm, L.L.C. v. Grant Stousland*, Case No. CV2011-014740 (Ariz. Super. Ct. Jan. 25, 2013). Waugh also claimed publicly to have filed a defamation lawsuit against Chris Kay, a former client, for derogatory online comments. Dkt. 185, Ex. F. In 2012, after Waugh's death, Smartcomm and Downs brought a claim for defamation against Warren Communications News, Inc. over an award-winning article that was critical of Smartcomm, titled "Questionable Value: Phoenix Company Prepares License Applications for Not-Yet-Available Spectrum." *See* Complaint, *Smartcomm, L.L.C. v. Warren Commc'ns News, Inc.*, Case No. CV2012 009126 (Ariz. Super. Ct. June 8, 2012). Smartcomm and Downs voluntarily withdrew the lawsuit in a settlement in which "Warren neither admitted any inaccuracies nor paid any damages." Dkt. 185 Ex. I.

The PSI Directors responded directly to the Fight Letter by sending a letter dated May 14, 2015, to the Company's investors. Dkt. 185 Ex. N (the "Response Letter"). Its first sentence stated, "By this letter we would like to update you on our plans for our upcoming shareholders meeting, and to respond to what we consider to be an egregious, libelous, and defamatory letter that was recently sent to most if not all of you by Edward Trujillo and his supporters ('the Trujillo Group')."

The Response Letter then described the Plenary Action that the Trujillo Group had filed and attached copies of the pleadings as exhibits. The complaint in the Plenary

---

than appears warranted," it was "technically accurate," and in any event did not affect the outcome of the election. Judy Litigation, Dkt. 456 at 3.

Action went into greater detail than the Fight Letter regarding the Association's allegations about the PSI Directors, yet the PSI Directors chose to distribute the complaint and its exhibits.

The Response Letter also called attention to the lawsuit that the PSI Directors had filed in Superior Court. The concluding paragraph of the Response Letter stated:

> All of you are also probably aware of the obscene, defamatory, and outrageously false letter that the Trujillo Group recently sent to most if not all of you. The Company, and each of its board members individually, have filed suit against the Preferred Investors Association, Edward Trujillo, Rachel Coughlin, Ted Kampen, James Solic and Joseph Washington for, among other things, libel and injurious falsehood. The board members are bearing their own expenses in the prosecution of this case.

The Response Letter attached "[a] summary of [the PSI Directors] responses to the numerous false statements made by the Trujillo Group" as well as a copy of the complaint that the PSI Directors and the Company had filed. The allegations of the complaint provided additional detail as to why the PSI Directors believed that the statements in the Fight Letter were false and contrary to the record.

## M. The Consolidated Proceeding

The PSI Directors and the Company originally filed their claims in Superior Court. Their initial complaint contained four counts:

- In Count I, the PSI Directors and the Company asserted a claim for libel *per se*, which is a commonly used term for defamation, against the Libel Defendants based on the content of the Fight Letter.

- In Count II, the PSI Directors and the Company asserted a claim for injurious falsehood against the Libel Defendants. The claim relied on the same conduct cited in Count I.

20

- In Count III, the PSI Directors and the Company asserted a claim for civil conspiracy against the Libel Defendants. The claim relied on the same conduct cited in Count I.

- In Count IV, the PSI Directors and the Company asserted a claim for aiding and abetting against the Libel Defendants. The claim relied on the same conduct cited in Count I.

By order dated July 31, 2015, the Superior Court transferred its case to this court, and the case was consolidated with the Plenary Action.

The Libel Defendants moved to dismiss the four counts of the original complaint. During briefing, the PSI Directors dropped their claim for injurious falsehood and the Company withdrew its claim for defamation. On November 8, 2015, the court heard argument on the Libel Defendants' motion.

While the motion was under submission, a change of control occurred at the Company. Shortly after the Superior Court action was filed, Judy switched sides and opposed the reelection of Knapp, Downs, and Kitka. In January 2016, holders of a majority of the Company's outstanding voting power delivered written consents that removed Downs, Knapp, and Kikta as directors and replaced them with Trujillo, Agar, and Kevin Shaffer. Scott and Judy remained in their positions. By letter dated January 19, 2016, Trujillo advised Knapp, Downs, and Kikta that they had been terminated from all of their positions with the Company.

In light of these developments, Knapp, Downs, and Kikta sought leave to file an amended complaint that would add allegations regarding lost compensation and other reputational harm. The court granted the motion. In March 2016, Judy and Scott sought to dismiss their claims against the Libel Defendants with prejudice pursuant to Rule

41(a)(2). The court granted that motion as well, leaving Knapp, Downs, and Kikta as the only Libel Plaintiffs.

The Libel Plaintiffs eventually filed the Complaint, which is the currently operative pleading. The Libel Defendants again moved to dismiss, the parties briefed the motion, and the court heard argument.

## II.    LEGAL ANALYSIS

The Libel Defendants have moved to dismiss the Complaint pursuant to Rule 12(b)(6). When considering such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).

To state a claim for defamation, a plaintiff must plead (i) the defendant made a defamatory statement, (ii) concerning the plaintiff, (iii) the statement was published, and (iv) a third party would understand the character of the communication as defamatory. *Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005). A communication is defamatory "if it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Spence v. Funk*, 396 A.2d 967, 969 (Del. 1978) (quoting Restatement (Second) of Torts § 559 (Am. Law Inst. 1977)).

22

## A.    The Anti-SLAPP Statute

In support of their motion to dismiss, the Libel Defendants argue that this action is subject to Delaware's anti-SLAPP statute. 10 *Del. C.* §§ 8136-38. A SLAPP is "a suit brought by a developer, corporate executive, or elected official to stifle those who protest against some type of high-dollar initiative or who take an adverse position on a public-interest issue (often involving the environment)." *SLAPP*, Black's Law Dictionary (10th ed. 2014). Many states, including Delaware, have adopted anti-SLAPP statutes to "provide a quick remedy for those citizens targeted by frivolous lawsuits based on their government petitioning activities by allowing them to bring a special motion to dismiss or motion to strike." 71 C.J.S. *Pleading* § 675 (2016).

Classifying this action as a SLAPP would have meaningful consequences. Among them, Delaware's anti-SLAPP law imposes a heightened standard to survive a motion to dismiss:

> A motion to dismiss in which the moving party has demonstrated that the action, claim, cross-claim or counterclaim subject to the motion is an action involving public petition and participation as defined in § 8136 of this title shall be granted unless the party responding to the motion demonstrates that the cause of action has a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law. The court shall grant preference in the hearing of such motion.

10 *Del. C.* § 8137(a).

Delaware decisions provide little guidance about the scope of Delaware's anti-SLAPP statute. Only one Delaware case has touched on the issue. *See Nichols v. Lewis*, 2008 WL 2253192, at *6 (Del. Ch. May 29, 2008) (Strine, V.C.), *aff'd sub nom.*, *Arday v. Nichols*, 956 A.2d 31 (Del. 2008) (TABLE). Given the paucity of authority, this opinion

23

starts by examining the concept of anti-SLAPP statutes generally, then assesses the scope of Delaware's anti-SLAPP statute against that background. The analysis indicates that the Libel Plaintiffs' claims do not fall within Delaware's anti-SLAPP statute.

### 1. Anti-SLAPP Statutes Generally

"A SLAPP suit refers to a suit brought in response to efforts by individuals or groups to participate in the democratic process by some person or entity that claims to have been wronged through that participation." Rodney A. Smolla, 2 *Law of Defamation* § 9:107 (2d ed. 2016). "A SLAPP . . . seeks to chill, dissuade, or punish a party's exercise of constitutional rights to free speech and to petition the government for redress of grievances. In such suits, a tort claim, such as slander or libel, is typically brought with the goal of silencing dissent." 71 C.J.S. *Pleading* § 675 (footnote omitted). The suits operate "to intimidate individuals and organizations that speak out against corporate decisions, development projects, government actions or operations, or other activities that affect their financial interests." Carson Hilary Barylak, *Reducing Uncertainty in Anti-SLAPP Protection*, 71 Ohio St. L.J. 845, 846 (2010). In other words, "[t]he SLAP-Ping party seeks not to secure a favorable judgment, but rather to engage in a retaliatory legal battle to stifle speech and mire a defendant in costly litigation. Such suits, by definition, are meritless." Benjamin Ernst, *Fighting Slapps in Federal Court: Erie, the Rules Enabling Act, and the Application of State Anti-SLAPP Laws in Federal Diversity Actions*, 56 B.C. L. Rev. 1181, 1182 (2015) (footnote omitted).

An anti-SLAPP statute responds to the threat posed by a SLAPP. "The intent of an anti-SLAPP statute is to encourage the exercise of free speech . . .[,] afford a procedural

protection to acts of communication on public issues. . . [,] and screen out meritless claims." 71 C.J.S. *Pleading* § 675.

More than half of the states have passed some form of anti-SLAPP legislation. Ernst, *supra*, at 1182-83. Their scope varies widely:

> Some are connected to classic "Petition Clause" activity, in that they focus primarily on acts of retaliation against persons who have attempted to participate in governmental processes or petition the government for redress or procurement of some governmental action. Others sweep more broadly, covering not merely "Petition Clause" activity but also "Speech Clause" activity more generally, providing protection for any acts of free speech or expression on issues of public concern.

Smolla, *supra*, § 9:109. "Some states attempt to limit coverage by the identity of the 'slapper,' so to speak. Only when the underlying SLAPP suit is brought by a particular type of person or entity may the anti-SLAPP law's protection be invoked." *Id.* "In this sense these states limit their laws to the very traditional SLAPP suit paradigm, such as a developer who files a SLAPP suit against citizens who opposed a proposed project before a zoning board or power commission." *Id.*

### 2. Delaware's Anti-SLAPP Statute

Delaware adopted its anti-SLAPP statute in 1992. The General Assembly modeled the statute on a substantively identical bill under consideration by the New York legislature. *See* 1992 N.Y. Sess. Laws Ch. 767 (McKinney), *codified at* N.Y. Civ. Rights Law § 76-a (McKinney 2015). The Delaware statute applies to an "action involving public petition and participation," which it defines as an "action, claim, cross-claim or counterclaim for damages that is brought by a public applicant or permittee, and is materially related to any efforts of the defendant to report on, rule on, challenge or

oppose such application or permission." 10 *Del. C.* § 8136(a)(1). It defines "public applicant or permittee" as "any person who has applied for or obtained a permit, zoning change, lease, license, certificate or other entitlement for use or permission to act from any government body." *Id.* § 8136(a)(4).

When a defendant moves to classify a lawsuit as a SLAPP, the statute initially places the burden on the "moving party [to] demonstrate[] that the action, claim, cross-claim or counterclaim subject to the motion is an action involving public petition and participation as defined in § 8136." *Id.* § 8137(a). If the lawsuit falls within the statute, then the plaintiff faces an incremental burden at every stage of the litigation. As noted, Section 8137 imposes a higher burden to survive a motion to dismiss. *Id.* If the action states a claim, then recovery is only possible if "the plaintiff, in addition to all other necessary elements, shall have established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue." *Id.* § 8136(b). If the case is unsuccessful, then the statute authorizes a discretionary award of attorneys' fees and compensatory damages. *Id.* § 8138. The statute even contemplates punitive damages, but only "upon an additional demonstration that the action . . . was commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights." *Id.* § 8138(a)(2).

### 3. Delaware's Anti-SLAPP Statute Does Not Apply.

The Libel Defendants contend that this action implicates Delaware's anti-SLAPP statute because it is "clearly designed to use the legal system and lawyers' fees as a club to deter free speech." Dkt. 197, at 14. They maintain that "[t]he suit was obviously designed to send a message[:] 'If you interfere with us, it will cost you money and lawyers' fees.'" *Id.* at 14-15. Based on a combination of factors, including the timing and content of the suit and the Libel Plaintiffs' history of pursuing similar actions, it is reasonable to infer at this stage that the Libel Plaintiffs filed their claims with that intent. But under Delaware's anti-SLAPP statute, intent is not enough. The claims must meet the statutory requirements.

As their statutory hook, the Libel Defendants' posit that they are "public applicant[s] or permittee[s]" because they received three "entitlements for use or permission to act" from this court. The first claimed entitlement is the order that Judy obtained from this court scheduling the 2013 Meeting. The Libel Defendants contend that the Fight Letter reported on the ultimate results of that meeting. *See* Dkt. 185 at 31-32. The second claimed entitlement is the court order "specifically designating [the PSI Directors] as elected as directors of PCSI." *Id.* at 32. The Libel Defendants argue that the Fight Letter "reported on their record as directors." *Id*. The third claimed entitlement is the order Trujillo obtained from this court scheduling the 2015 Meeting. The Libel Defendants say that the Fight Letter "reported on that entitlement by advocating that [the PSI Directors] not be re-elected at that meeting." *Id*.

27

The determinative issue is the meaning of "other entitlement for use or permission to act." Delaware's anti-SLAPP statue does not define these words. The parties have not cited, and this court has not found, any helpful cases. This decision relies on the plain language of the statute to construe them. This decision also looks to legislative history, which corroborates the plain language construction.

### a. Statutory Language

"The starting point in statutory construction is to determine the legislative intent from the language of the statute itself. The statutory words should be given the meaning intended by the lawmakers." 82 C.J.S. *Statutes* § 410 (footnote omitted); *accord Kofron v. Amoco Chemicals Corp.*, 441 A.2d 226, 230 (Del. 1982). "Where a statute is ambiguous, it should be interpreted in a way that will promote its apparent purpose and harmonize it with the statutory scheme." *Del. Bd. of Nursing v. Gillespie*, 41 A.3d 423, 427 (Del. 2012) (internal quotations and citation omitted).

When interpreting statutory language, Delaware courts deploy well-established canons of statutory interpretation. *Id.* One relevant canon is *ejusdem generis*, which

> instructs that where general language follows an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.

*Gillespie*, 41 A.3d at 427-28 (internal quotations omitted). Another relevant canon is *noscitur a sociis*, which requires that words "be interpreted in the context of words surrounding them." *Zimmerman v. Crothall*, 2012 WL 707238, at *7 (Del. Ch. Mar. 27, 2012) (citing *Gutierrez v. Ada*, 528 U.S. 250, 255 (2008)).

28

Both statutory canons indicate that the three court orders are not "other entitlement[s] for use or permission[s] to act." The canon of *ejusdem generis* calls upon the court to consider the enumerated entitlements that precede the phrase in question, which are "permit, zoning change, lease, license, [and] certificate." 10 *Del. C.* § 8137(a)(4). All relate to land use. The canon indicates that the words "other entitlement for use or permission to act" also relate to land use. *Id.*

The canon of *noscitur a sociis* requires the court to interpret words as part of the larger phrase in which they appear. Here, the words appear as part of the definition of "public applicant or permittee," which is defined as "any person who has applied for or obtained a permit, zoning change, lease, license, certificate or other entitlement for use or permission to act from any government body." 10 *Del. C.* § 8136(a)(4). Read in context, the "other entitlement for use" is something that a "public applicant or permittee" obtains, and it is part of a catch-all phrase that includes "permission to act." These concepts resonate with the theme of land use, where a "public applicant or permittee" obtains an entitlement "for use" in developing property or the "permission to act" regarding property.

The words and phrases that the General Assembly chose indicate that the types of court orders that the Libel Defendants cite are not "other entitlements for use or permission to act" within the meaning of Delaware's anti-SLAPP statute. The statutory text suggests a relatively narrow focus on traditional SLAPP scenarios. Consistent with

29

this view, scholars have described Delaware's anti-SLAPP statute as "limit[ed] . . . to the very traditional SLAPP paradigm."[4]

The text of Delaware's anti-SLAPP statute does not suggest, as the Libel Defendants claim, that the General Assembly sought to create an expansive shield against any lawsuit brought with an intent to muzzle or inflict retribution for free speech. If the General Assembly had intended to follow a broader course, then it would have used more sweeping language. California's anti-SLAPP statute provides a model for that approach:

> As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of

---

[4] Smolla, *supra*, § 9-109. *See also* Shannon Hartzler, Note, *Protecting Informed Public Participation: Anti-SLAPP Law and the Media Defendant*, 41 Val. U. L. Rev. 1235, 1248-49 (2007) (including Delaware in a list of twelve states with "Narrow Statutes" which "limit[] the use of anti-SLAPP law to specific sets of circumstances"); Mark J. Sobczak, Comment, *Slapped in Illinois: The Scope and Applicability of the Illinois Citizen Participation Act*, 28 N. Ill. U. L. Rev. 559, 577 (2008) (contrasting Illinois' broad statute with narrower laws in Delaware, Nebraska, and New York); Landon A. Wade, Comment, *The Texas Citizens Participation Act: A Safe Haven for Media Defendants and Big Business, and A SLAPP in the Face for Plaintiffs with Legitimate Causes of Action*, 47 Tex. Tech L. Rev. Online Edition 69, 81 (2014) (classifying the anti-SLAPP statutes of Delaware, New York, and Nebraska within the narrowest class of statutes); London Wright-Pegs, Comment, *The Media SLAPP Back: An Analysis of California's Anti-SLAPP Statute and the Media Defendant*, 16 UCLA Ent. L. Rev. 323, 332-33 (2009) (placing 10 *Del. C.* § 8136 within the narrowest class of SLAPP legislation).

public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Cal. Civ. Proc. Code § 425.16(e) (West 2015). Rather than using an expansive model, the General Assembly followed New York's lead. Courts applying New York's substantially identical statute have interpreted it narrowly and held that it is "available in only relatively rare circumstances."[5]

The plain language of the Delaware's anti-SLAPP statute thus suggests a narrow purpose of addressing classic SLAPPs. The three orders that the Libel Defendants cite do not meet this traditional scenario. The Libel Plaintiffs' lawsuit is therefore not a SLAPP.

### b. Legislative History

Although the plain language of Delaware's anti-SLAPP statute is dispositive, the legislative history helpfully confirms the narrow construction. It reveals that the General Assembly focused on traditional SLAPPs relating to land use. The General Assembly was not seeking to establish a broad legal protection against defamation claims.

---

[5] *See, e.g.*, *Gilman v. Spitzer*, 902 F. Supp. 2d 389, 397 (S.D.N.Y. 2012) (quoting Robert D. Sack, *Sack on Defamation* § 16:2.3 (4th ed. 2012)) (footnote omitted), *aff'd*, 538 F. App'x 45 (2d Cir. 2013). *See also Silvercorp Metals Inc. v. Anthion Mgmt. LLC*, 948 N.Y.S.2d 895, 898 (Sup. Ct. 2012) (concluding that there is "no authority" to adopt "an expansive definition of 'public applicant or permittee' [which] would effectively subject every publicly held corporation filing a defamation suit in New York to an anti-SLAPP counterclaim"); *Hariri v. Amper*, 854 N.Y.S.2d 126, 130 (App. Div. 2008); *Harfenes v. Sea Gate Ass'n, Inc.*, 647 N.Y.S.2d 329, 333 (Sup. Ct. 1995) ("A loan application is not an application for an 'entitlement for use or permission to act from [a] government body.'"); *cf. Egiazaryan v. Zalmayev,* 2011 WL 6097136, at *12 (S.D.N.Y. Dec. 7, 2011) (concluding that "a petition for asylum . . . is an application for 'permission to act'").

The most prevalent source of legislative history for a Delaware statute is the synopsis, which the Delaware Supreme Court has held is "a proper source for ascertaining legislative intent." *Bd. of Adjustment of Sussex Cnty. v. Verleysen*, 36 A.3d 326, 332 (Del. 2012). The synopsis for the anti-SLAPP statute states that the law "provides that a plaintiff who has applied for or obtained a permit, zoning change *or other such governmental approval* from a government body must prove 'actual malice' in a lawsuit that is based on the defendant's opposition to such application or approval." Del. S.B. 228 syn., 136th Gen. Assem. (1991) (emphasis added). The synopsis thus substitutes the phrase "other such government approval" in place of "other entitlement for use or permission to act." This substitution indicates that the drafters regarded the concepts of "other entitlement" and "permission for use" as "governmental approvals" akin to a "permit" or a "zoning change." The synopsis thus underscores the focus on land use disputes.

Delaware's anti-SLAPP statute is a rare instance where floor debates also are available. In the State House of Representatives, the debate lasted about four minutes, and the lawmakers focused exclusively on SLAPPs relating to land use. Representative Charles Hebner stated, "Often times when something is happening in the zoning area or other similar situations, we have individuals who are intimidated by the larger corporations involved." Dkt. 189, Ex. B3 (audio recording). Representative George Bunting explained that he had been

> personally involved with a situation in my own district where a spokesperson for a community association spoke out having to deal with a major mobile home park owner, and he was slapped with a[n] over half a

million dollar lawsuit. This seems to be a trend across our country right now where individuals who speak out in a public forum are hit with a suit in order to silence them. And that's why I'm supportive of this legislation, which will help I think, for that situation.

*Id.*

The debate in the State Senate lasted about twenty-one minutes. The participants again focused exclusively on land use. Senator David P. Sokola, the sponsor of the bill, provided a brief background after another senator expressed confusion as to the bill's purpose. He discussed the general concept of SLAPPs, then gave an example in which a citizen faced a lawsuit after she made public comments about the expansion of a landfill. He expressed his desire to see citizens protected from "this kind of litigation." Dkt. 189, Ex. B1 (audio recording).

Next, Senate Attorney Arthur G. Connolly III responded to questions. He confirmed that the bill would apply to "an action brought by the developer against a community group or individuals" and "it could also apply in the event . . . of a lawsuit brought by a civic organization against a developer who would then turn around and counterclaim and basically bring a new suit within that action." *Id.* Marian Stewart, speaking on behalf of the Civic League of New Castle County, asked the General Assembly to pass the bill "and protect citizens who would like to get up before the county council and object to developments or shopping centers or what have you without being sued for their temerity in so doing." *Id.* All of these comments focused on land use.

The Libel Defendants stress the following exchange between Senate Attorney Connolly and Senator Harris B. McDowell III, which they say supports a broad reading:

Senator McDowell: If we determine that it is necessary by statute to protect citizens in these cases [referring to the example of a developer, a zoning permit, and a landfill], are we of necessity going to have to then go and do it in every case where a citizen would come forward, including when we invite a citizen to come and speak … [to address] a bill here on the senate floor.

Attorney Connolly: I'm not sure . . .

Senator McDowell: I'm concerned because this only covers [this] instance I think [it] doesn't cover all areas where a citizen might come.

Attorney Connolly: I think you're right, this addresses a specific area.

Senator McDowell: A specific area. I'm concerned that by doing that we leave the implication that we're not doing it in some other areas.

Attorney Connolly: Well, that's valid.

Senator McDowell: Maybe what we need to do is get on the record that we don't intend to do that.

Dkt. 189 Ex. B2 (audio recording). The Libel Defendants interpret this exchange as evidencing legislative "concern that the statute might be interpreted too narrowly" and an intent that "approval of the bill should not be interpreted as excluding similar cases from the statute's coverage." Dkt. 192 at 18.

These comments will not bear the weight that the Libel Defendants' place on them. The overall thrust of the exchange was to recognize that the bill was limited to "a specific area" and did not provide a broader remedy. Senator McDowell accepted the limited scope of the bill. He was not concerned about its narrow scope, but rather that there was no express language to that effect. He cited "an implication" that the bill did

34

not extend to other areas, and he expressed concern that this was not sufficient. He proposed making the narrow scope of the law explicit.

Senator McDowell also referred the example of a citizen testifying about a bill before the General Assembly, which is another area where citizens could come into conflict with powerful interests who could respond with retributive lawsuits. As a matter of common law, the citizen's testimony in that situation would be privileged and not subject to a defamation claim. *See* Restatement (Second) of Torts, § 590A ("A witness is absolutely privileged to publish defamatory matters as part of a legislative proceeding in which he is testifying . . . if the matter has some relation to the proceeding."). Senator McDowell's comments suggest a concern that by granting anti-SLAPP protection in a "specific area," the law might imply an intent not to protect "other areas," including those where common law protections traditionally applied. Senator McDowell therefore sought to clarify that by providing anti-SLAPP protection in the "specific area" of land use, the General Assembly was not making a policy determination about other areas. Consistent with this reading, Senator McDowell made the following additional statement a few minutes later: "I would just like to put on the record that my support and vote as a co-sponsor and voter for this legislation in no way implies that any other areas that we are not including in this legislation that we are purposely excluding them from the protections provided herein." Dkt. 189 Ex. B2. Senator McDowell thus sought to leave "other areas" open by recognizing that the anti-SLAPP legislation was narrow and did not extend beyond land use.

The legislative history supports the conclusion that Delaware's anti-SLAPP statute does not apply to the entitlements on which the Libel Defendants rely. Because the Libel Plaintiffs' claims do not meet the statutory definition, the Complaint is not a SLAPP for purposes of Delaware's anti-SLAPP statute.

**B.      Limited-Purpose Public Figures**

Even if the Libel Plaintiffs' claims do not fall within Delaware's anti-SLAPP statute, a heightened pleading standard still governs the Complaint if the Libel Plaintiffs are public figures. This decision holds that the Libel Plaintiffs are public figures for the limited purpose of election-related communications among the Company's investors.

"The law of libel enjoys a constitutional grounding." *Ramunno v. Cawley*, 705 A.2d 1029, 1035 (Del. 1998). The United States Supreme Court has restricted defamation claims brought by public figures in order to provide "breathing space" for the exercise of First Amendment rights. *New York Times v. Sullivan*, 376 U.S. 254, 298 (1964). Public figures must establish two additional elements to prevail on a defamation claim. First, they bear the burden of pleading (and later proving) that the statements are false, as opposed to the common law rule under which truth operates as an affirmative defense. *Doe v. Cahill,* 884 A.2d 451, 463 (Del. 2005) (citing *Philadelphia Newspapers v. Hepps*, 475 U.S. 767 (1986)). Second, they must plead (and later prove) that the defamatory statements were made with "actual malice," a term of art meaning that the maker knew the statement was false or acted with reckless disregard for the truth. *Id.* (citing *Sullivan*, 376 U.S.).

The question of whether a plaintiff is a public figure is "one of law, not of fact." Restatement (Second) of Torts § 580A cmt. c. There are two types of public figures: all-purpose and limited-purpose.

> In some instances, an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). "Determining public or private figure status is no exact science." Smolla, *supra*, § 2:55. The "line between public figures and private individuals" can be thin. *Rosanova v. Playboy Enters., Inc.*, 411 F. Supp. 440, 443 (S.D. Ga. 1976) *aff'd*, 580 F.2d 859 (5th Cir. 1978). The best method is to consider the rationale for recognizing public-figure status and then to determine whether it applies to the facts of the case.

The United States Supreme Court has explained that the "rationale for extending the [actual malice standard] to public figures was two-fold." *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 164 (1979). First, "public figures are less vulnerable to injury from defamatory statements" because of "greater access . . . to channels of effective communication, which enable them through discussion to counter criticism and expose the falsehood and fallacies of defamatory statements." *Id.* Second, "public figures are less deserving of protection than private persons because public figures, like public officials, have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." *Id.* (internal quotation marks and citations omitted).

When individuals seek to serve as directors of an organization, they meet the second rationale for public figure status. An instructive precedent is *Korbar v. Hite*, 357 N.E.2d 135 (Ill. App. Ct. 1976). The plaintiff, William C. Korbar, recently had been elected president of a credit union that a company maintained for its employees. The defendant, Thomas Hite, served as president of a union local whose members worked for the company and were members of the credit union. Hite wrote to Korbar and asked for a meeting to discuss issues of importance to the employees. He also wanted the credit union to allow members to withdraw the standing proxies they had signed in favor of management. Korbar declined to meet and denied that the credit union had ever refused any member's request to have his proxy revoked.

Hite then wrote an article titled, "Is Your Credit Union Above Board?" that appeared in the union's newspaper. The first paragraph read as follows:

> The question, is your credit union serving you or is it headed by a president that is insensitive to your needs or desires? I think that these are some of the questions that you should be interested in getting an answer to before you think about putting the same Board of Directors back in at the next Annual Meeting. From what has been told to me, your credit union seems to be run by a president and a majority of the Board of Directors that think that they own it and anytime you seek service from them, they will be doing you a favor.

*Id.* at 136-37. The article went on to describe the communications between Korbar and Hite and to express Hite's views on a series of issues. *Id.* at 137.

Korbar sued Hite for defamation. The trial court dismissed the claim, and the Appellate Court of Illinois affirmed. The Appellate Court held that Korbar had "thrust himself into the forefront of the action by virtue of being elected president" of the credit

union and that "[i]n so doing, he invited attention and comment on his official conduct and policies." *Id.* at 139. The Appellate Court posited that Korbar "could be deemed a public figure for all purposes" but found it "clear that in this context [that Korbar] may not use the protection afforded a private individual to insulate himself from such comment." *Id.*

Other courts similarly have held that candidates who seek to be elected to lead organizations become limited public figures for purpose of communications related to the election.[6] The Massachusetts Supreme Court reached this conclusion for a candidate for office in a union election, explaining that "[t]he plaintiff voluntarily thrust himself into the controversy by campaigning for reelection to the position of secretary-treasurer of Local 526" and that "[i]n the context of a union election campaign, the plaintiff, as an incumbent, should expect criticism of his record." *Materia v. Huff*, 475 N.E.2d 1213, 1215 (Mass. 1985) (collecting cases). New Jersey's intermediate appellate court held that a candidate in an election for a seat on the board of a condominium association was a public figure for the limited purpose of statements made in the context of his election because he chose to involve himself in a "hotly contested" race. *Gulrajaney v. Petricha*, 885 A.2d 496, 505 (N.J. Sup. Ct. App. Div. 2005); *accord Verna*, 852 A.2d at 214

---

[6] All candidates who run for or hold public office are considered public figures. *See Gertz*, 418 U.S. at 344; *Verna v. Links at Valleybrook Neighborhood Ass'n, Inc.*, 852 A.2d 202, 214 (N.J. Super. Ct. App. Div. 2004) (compiling and discussing cases from multiple states which held that candidates for national and local office, including candidates for appointment to public agencies like medical boards and union offices, are limited-purpose public figures).

(holding that a candidate for a planned unit development association's board was a limited purpose public figure because "[a]s a candidate for election to the association's board of directors, plaintiff thrust himself into a spotlight which justified viewing him as a public figure for the limited purpose of his candidacy"). A California court has taken the further step of holding that a plaintiff who campaigned actively against a candidate for election as an officer of a homeowners association and in favor of a competing slate became a public figure for purposes of statements the candidate made about her at the annual meeting, reasoning that the plaintiff voluntarily inserted herself into the election controversy through her active campaigning. *See Cabrera v. Alam*, 129 Cal. Rptr. 3d 74, 86 (Ct. App. 2011). A Pennsylvania court has applied these principles to a stamp-collecting society, holding that a candidate for its presidency was a "public figure for the limited purpose of [the organization] and its election." *Lawrence v. Walker*, 9 Pa. D. & C. 5th 225, 229 (Ct. Com. Pl. 2009).

Under these precedents, the Libel Plaintiffs were public figures for the limited purpose of electoral-related communications. By becoming directors of PCSI, the Libel Plaintiffs voluntarily assumed roles in which they knowingly ran "the risk of closer public scrutiny." *Gertz*, 418 U.S. at 344. As Chief Justice Strine has observed (admittedly in the context of a public company), corporate officers "should expect to endure publicity." *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *49 (Del. Ch. July 12, 2010) (Strine, V.C.). "Although they may not have committed a breach of fiduciary duty by exposing themselves to responsibility in damages, they cannot avoid responsibility in

40

the more colloquial sense for presiding in important ways over the functions of the corporation that were not carried out properly." *Id.*

At PCSI, corporate functions had not been carried out properly for many years. The Libel Plaintiffs chose to seek positions as directors, and they prevailed at the 2013 Meeting through a contested proxy contest. They knew that the Association opposed them and was not going away, and they knew that both the Association and PCSI's other investors would be monitoring their actions. By running for and taking office as directors of PCSI, the Libel Plaintiffs became stewards of an entity in which the investors had a "justified and important interest." *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 134 (1967). The Libel Plaintiffs then confirmed their decision to "voluntarily expose[] themselves to increased risk of injury from defamatory falsehood" by standing for reelection. *Wolston*, 443 U.S. at 164. As in *Korbar*, they "invited attention and comment on [their] official conduct and policies," and they cannot "use the protections afforded a private individual to insulate themselves" from comment on their actions. 357 N.E.2d at 139.

The first rationale for limited-purpose public figure status also applies to the Libel Plaintiffs. The United States Supreme Court cited "greater access . . . to channels of effective communication, which enable them through discussion to counter criticism and expose the falsehood and fallacies of defamatory statements," as a basis for public figure status. *Wolston*, 443 U.S. at 164. As directors of the Company, the Libel Plaintiffs had access to internal corporate information they could use to respond to any allegations of misconduct. They could instruct the Company's employees to develop rebuttals to the Association's contentions. They could deploy corporate funds to communicate with

41

investors by multiple means. They also controlled the content of the corporation's proxy statement and the form of its proxy card. The Libel Plaintiffs in fact utilized these resources by sending out the Response Letter. They also caused the Company to join them in suing the Libel Defendants for defamation and injurious falsehood, although the Company later dropped its claims, and they distributed copies of their complaint to the Company's investors.

This decision therefore concludes that the Libel Plaintiffs were public figures for the limited purpose of election-related communications among the Company's investors. Further support for this conclusion comes from cases holding that individuals can be public figures for the limited purpose of communications to a circumscribed group. When the Illinois Appellate Court held in *Korbar* that the president of a credit union whose members were company employees was a limited-purpose public figure, the court took into account that the allegedly defamatory article "was published in a union newspaper by a member of the credit union concerning a matter of general interest to the membership." 357 N.E.2d at 162. New Jersey's intermediate appellate court similarly held that an individual was a public figure for the limited purpose of statements made within the more esoteric community of Corvette restoration hobbyists where the individual had established himself as a public figure on the limited issue of Corvette restoration fraud. *MacKay v. CSK Publishing Company*, 693 A.2d 546, 614 (N.J. Sup. Ct. App. Div. 1997). In this case, within the limited community of the Company's investors, the Libel Plaintiffs were public figures.

Because the Libel Plaintiffs are limited-purpose public figures, the Complaint only can survive a motion to dismiss if it supports reasonably conceivable inferences that (i) one or more particular statements in the Fight Letter were false and (ii) the Libel Defendants made the statements with actual malice. This decision next examines the three categories of statements that appeared in the Fight Letter and which the Libel Plaintiffs contend meet the requisite pleading standard.

## C.    The Looting Allegations

In their primary claim, the Libel Plaintiffs assert that the Fight Letter "explicitly or implicitly through innuendo stated that Plaintiffs 'looted' the Company for personal gain in contravention of both criminal and civil law." Compl. ¶ 59. The Libel Defendants respond that the concept of "looting," at least as used in the Fight Letter, does not inherently contemplate illegality, but rather expresses the authors' personal opinion about the Libel Plaintiffs' management of the Company. The distinction is significant because "[w]hile allegations of specific criminal conduct generally cannot be protected as opinion, broad brush-stroked references to unethical conduct, even using terms normally understood to impute criminal acts, may be understood by the reasonable viewer as opinion."[7]

---

[7] *Launderback v. Am. Broad. Co.*, 741 F.2d 193, 197 (8th Cir. 1984). *Compare Held v. Pokorny*, 583 F. Supp. 1038, 1040 (S.D.N.Y. 1984) ("Accusations of criminal or unethical activity . . . are expressions of fact, as are allegations relating to one's professional integrity that are susceptible of proof." (footnote omitted)), *Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 62 (2d Cir. 1980) ("A statement that Cianci raped Redick at gunpoint twelve years ago and then paid her in an effort to obstruct justice falls within the Court's explication of false statements of fact rather than its illustrations of false ideas

The First Amendment of the United States Constitution generally protects expressions of opinion. *See Kanaga v. Gannett Co.*, 687 A.2d 173, 177 (Del. 1996). This does not mean that there is a "wholesale defamation exemption for anything that might be labeled opinion." *Id.* (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)). Rather, the touchstone is whether "an ordinary reader of the statement" would regard the statement as an expression of opinion. *Riley v. Moyed*, 529 A.2d 248, 251 (Del. 1987).

To distinguish between fact and opinion, the Delaware Supreme Court has adopted the influential four-part test that the United States Court of Appeals for the District of Columbia Circuit first articulated in *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984). *Riley*, 529 A.2d at 251-52. "First, the Court should analyze the common usage or meaning of the challenged language. Second, the Court should determine whether the statement can be objectively verified as true or false. Third, the Court should consider the

where public debate is the best solvent."), *Catalano v. Pechous*, 419 N.E.2d 350, 359 (Ill. 1980) (accusation that plaintiff accepted a bribe "was a statement of fact and not the constitutionally protected expression of an opinion"), *and Rinaldi v. Holt, Rinehart & Winston, Inc.*, 366 N.E.2d 1299, 1307 (N.Y. 1977) (accusation that plaintiff is "probably corrupt" had "strong undertones of conspiracy and illegality," and an "ordinary and average reader would likely understand the use of these words, in the context of the entire article, as meaning that plaintiff had committed illegal and unethical actions" which could not constitute opinion and was not constitutionally protected), *with Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler* , 398 U.S. 6, 14 (1970) (descriptive use of "blackmail" in context did not refer to criminal conduct), *and Karnell v. Campbell*, 501 A.2d 1029, 1035 (N.J. Super. Ct. App. Div. 1985) ("While Rosenblatt's letter uses the words 'theft' and 'rape,' any reader would understand that she was not accusing plaintiffs of the crimes of rape or theft any more than the opponents of the developer in *Greenbelt* were accusing him of 'blackmail.'"). For a more expansive case history detailing this distinction, *see* David Elder, *Defamation: A Lawyer's Guide* § 8:27 (2016).

full context of the statement. Fourth, the Court should consider the broader social context into which the statement fits." *Id.*

The first factor examines the common usage or meaning of the allegedly defamatory statements. The purpose of this factor is to determine if the statement has a precise meaning, because "[r]eaders are … considerably less likely to infer facts from an indefinite or ambiguous statement than one with a commonly understood meaning." *Ollman*, 750 F.2d at 979.

"Looting is a word used in a variety of contexts. The law has never precisely defined it."[8] The classic meaning is the taking of goods by a conquering army.[9] It can also mean robbery in the wake of civil unrest.[10] The notion of "corporate looting" or "looting a company" has different connotations.[11] Looting in this sense does not involve the taking of tangible property by force, but rather the taking of intangible property through exploitation or manipulation.[12] Moreover, white collar "looting" describes not just illegal conduct, but can refer to any transfer of company assets deemed wrongful by the observer. Private equity companies are accused of "looting" when they sell pieces of

---

[8] Roger D. Scott, *Looting: A Proposal to Enhance the Sanction for Aggravated Property Crime*, 11 J.L. & Pol. 129, 140 (1995). *See also* Stuart P. Green, *Looting, Law, and Lawlessness*, 81 Tul. L. Rev. 1129, 1136-46 (2007) (discussing various definitions).

[9] Scott, *supra*, at 141; Green, *supra*, at 1136-37.

[10] Scott, *supra*, at 129 ("Th[e] word conjures up memories of the televised images of the sack of Los Angeles in April, 1992.").

[11] Green, *supra*, at 1139-1140.

[12] *Id.*

companies to extract value.[13] Corporate executives are accused of "looting" when they bargain for generous compensation packages.[14] An accusation of corporate looting, then, may or may not incorporate illegality. This factor favors the Libel Defendants.

The second factor is whether the truth or falsity of the statement is objectively verifiable. Accusing someone of "looting" is objectively verifiable if the term contemplates criminality. But as noted above, the concept of corporate looting can convey only a personal moral judgment. As such, it is a subjective belief that could not be proven true or false. *See Riley*, 529 A.2d at 252. The Fight Letter involved allegations of corporate looting, which carry connotations of moral judgment. The second factor therefore favors the Libel Defendants.

The third factor is the context of the statements within the writing as a whole. The Fight Letter as a whole makes clear that the Libel Defendants were not accusing the PSI Directors of the crime of looting, *i.e.* physical robbery,[15] but rather of transferring

---

[13] *See, e.g.*, Daniel Greenwood, *Looting: The Puzzle of Private Equity*, 3 Brook. J. Corp. Fin. & Comm. L. 89 (2008).

[14] *See, e.g.*, Kenneth R. Davis, *Taking Stock—Salary and Options Too: The Looting of Corporate America*, 69 Md. L. Rev. 419, 419 (2010) ("Executive compensation has come to mean corporate greed. Too many managers appointed to protect the interests of shareholders are looting their companies."); Troy A. Paredes, *Too Much Pay, Too Much Deference: Behavioral Corporate Finance, CEOs, and Corporate Governance*, 32 Fla. St. U. L. Rev. 673, 703 (2005) (observing that critics claim executive compensation "amount[s] to little more than corporate looting.").

[15] *See* 20 *Del. C.* § 3128 (making it a crime to "[d]uring a state of emergency . . . maliciously destroy[] or damage[] any real or personal property of another.").

Company money to themselves and their affiliates.[16] The Fight Letter never describes the Libel Plaintiffs' conduct in criminal terms. It uses words like "siphon," "funnel," and "take," rather than explicitly criminal terms such as "embezzle," "steal," or "rob." Unlike the cases cited by the Libel Plaintiffs, the words in the Fight Letter do not specifically "accuse [the Libel Plaintiffs] of having committed a punishable crime."[17]

The Libel Plaintiffs alternatively argue that the word "looter" connotes a violation of civil law. The term is sometimes used to describe a director's breach of fiduciary duty.[18] But the Libel Plaintiffs offer no authority holding that that such an allegation necessarily incorporates a factual assertion to that effect. Indeed, the only two defamation

---

[16] *See, e.g.*, *Bressler*, 398 U.S. at 14 (use of word "blackmail" was not criminal allegation given broader context of article establishing that it was in reference to negotiating tactics); *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers AFL-CIO v. Austin*, 418 U.S. 264 (1974) (calling non-union workers "traitors" was not a criminal accusation).

[17] *Pierce v. Burns*, 185 A.2d 477, 479 (Del. 1962). *Compare Cianci*, 639 F.2d at 62 (specifically accusing plaintiff of "rape"); *Catalano*, 419 N.E.2d at 359 (statement that plaintiff accepted a bribe); *Dubinsky v. United Airlines Master Exec. Council*, 708 N.E.2d 441, 450 (Ill. App. Ct. 1999) (specifically accusing plaintiff of "racketeering"); *accord* Elder, *supra*, § 6.89 ("*At least when phrased in relatively specific terms*, [criminal] allegations will not be construed as protected opinion.") (emphasis added).

[18] *See Brinckerhoff v. Tex. E. Prods. Pipeline Co., LLC*, 2008 WL 4991281, at *7 (Del. Ch. Nov. 25, 2008) ("Looting TEPPCO in favor of Enterprise would clearly be a breach of Duncan's fiduciary duties as a manager of TEPPCO."); *Frank v. Engle*, 1998 WL 155553, at *1 (Del. Ch. Mar. 30, 1998) (discussing an accusation by shareholders of "a systematic looting of Sunstates by causing Sunstates to make bogus loans, engage in sham transactions, award undeserved bonuses, and waste its assets in sundry ways"); *Bragger v. Budacz*, 1994 WL 698609, at *3 (Del. Ch. Dec. 7, 1994) (Allen, C.) ("[P]laintiff asserts that Dover received confidential information to its benefit through the services of Roubos and Burns as directors of DOVatron without paying any compensation (i.e., looting its former wholly owned subsidiary).").

47

cases that the court has found addressing accusations of breaches of fiduciary duty treated them as expressions of opinion.[19] Moreover, the Fight Letter as a whole does little to tie the Looting Allegations to a breach of fiduciary duty. The Fight Letter references fiduciary duties only once, and even in that instance it does not explicitly accuse the Libel Plaintiffs of breach.[20] The absence is striking considering that the Libel Defendants sued the Libel Plaintiffs for breach of fiduciary duty, and the Fight Letter discusses that litigation. But the Fight Letter never asserts that the Libel Plaintiffs breached their duties.

The language of the Fight Letter as a whole does not support an inference that the Looting Allegations contemplated criminal or illegal conduct. Rather, the language conveyed the Libel Defendants' hyperbolic characterization of the behavior described in the Fight Letter. Like the Looting Allegations, much of the tone of the Fight Letter is exaggerated,[21] speculative,[22] and entirely one-sided. A reader would not associate these

---

[19] *See Cummins v. Suntrust Capital Mkts, Inc.*, 649 F. Supp. 2d 224, 256 (S.D.N.Y. 2009) (statement suggesting a breach of fiduciary duty "was plainly an opinion based on the disclosed factual circumstances . . . rather than an actionable assertion of a materially false fact."); *United Consumers Club, Inc. v. Bledsoe*, 2006 WL 2361818, at *10 (N.D. Ind. Aug. 14, 2006) ("The counterdefendants' position that UCC acted in a retaliatory, illegal manner and breached their contracts and fiduciary duties simply states their legal position and is more fairly described as an opinion.").

[20] Compl., Ex. A, at 2 ("Knapp and the Directors owe you their fiduciary duty to protect the Company assets but instead they are favoring these other affiliates and themselves.").

[21] *See, e.g.*, *id.* at 1 ("The Company vigorously opposed honoring payment."); *id.* ("The Company was forced kicking and screaming to settle."); *id.* ("They are intent now on buying your vote."). *Compare Riley*, 529 A.2d at 252.

qualities with factual assertions. *Compare Riley*, 529 A.2d at 252 (noting "caustic bombast" of newspaper editorials). Rather, they are the hallmark of personal opinion. In context, a reader would regard the word "looting" as hyperbole used to convey the Libel Defendants' strong disapproval of the Libel Plaintiffs' conduct. The third factor favors the Libel Defendants.

The fourth factor is the broader social context or setting in which the statement appears. The Delaware Supreme Court has recognized that certain forms of writing "by their very nature . . . are not a source of facts or data upon which a reasonable person would rely."[23] The Looting Allegations appeared in a fight letter sent in the midst of a heated proxy contest. The competing factions were "combatants engag[ed] in a battle for votes." R. Franklin Balotti, et al., *Meetings of Stockholders* § 13.1 (2015). "Proxy fight letters are pitches for a cause, and tend towards emphatic language in order to sway shareholders to the dissident's side." *Id.* § 12.8. "Charges of incompetence, ignorance, unethical and/or illegal conduct, or dishonesty, either direct or by innuendo, are not uncommon in corporate control struggles." Thomas C. Arthur, Tom Kirby & Bert W. Rein, *Defamation Suits as a Weapon in Corporate Control Battles*, 37 Bus. L. 1, 3

---

[22] *See, e.g.*, *id.* at 1 ("They are so afraid of you finding out what they are up to."); *id.* at 2 ("They haven't disclosed any of this because they want you to think that they are doing this all on their own.").

[23] *Doe v. Cahill*, 884 A.2d at 465 (noting the known unreliability of internet blogs and chat rooms). *See also Riley*, 529 A.2d at 252 (same for newspaper editorials); *SunEnergy 1, LLC v. Brown*, 2015 WL 7776625, at *4 (Del. Super. Nov. 30, 2015) (same for online reviews).

(1981). The context in which the Fight Letter was sent makes it highly unlikely that the Company's stockholders would view the Looting Allegations as alleging criminal conduct.

When analyzing the fourth factor, courts also have considered whether an adversarial relationship exists between the parties described in the communication. The United States Supreme Court has twice held that statements connoting criminality were not factual when made during a heated public debate.[24] The Supreme Court recognized that "to use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies . . . is not to falsify facts." *Austin*, 418 U.S. at 284. The Delaware Supreme Court has applied this doctrine to statements in a newspaper article suggesting that a local politician had accepted bribes, noting that the statements were made during a heated public debate such that "language which might otherwise be considered statements of fact here assumed the character of opinion." *Riley*, 529 A.2d at 253.

Here, investors reading the Fight Letter knew that the Libel Plaintiffs and the Libel Defendants were staunch adversaries engaged in a lengthy battle over the Company. They knew that the two sides were supporting competing slates. They also knew from the

---

[24] *Austin*, 418 U.S. at 284 (calling plaintiff a "traitor" in the course of a labor dispute was nonactionable opinion); *Bresler*, 398 U.S. at 14 (holding a characterization of a real estate developer's position as blackmail to be nonactionable opinion because, in context, "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous ephitet used by those who considered Bresler's negotiating position extremely unreasonable.")

Fight Letter that the Libel Defendants had sued the Libel Plaintiffs, and they knew from the Response Letter that the Libel Plaintiffs had counter-sued the Libel Defendants. Many of the recipients had participated in the Judy Litigation and knew about the Association's opposition to the PSI Directors from that legal campaign. Other recipients were plaintiffs in the Plenary Action and had made more serious allegations against the PSI Directors. Many had been stockholders at the time of the 2013 Meeting, when both factions sent fight letters and then litigated over the results of the election. In this broader context, investors would understand that the Looting Allegations were "vigorous epithet[s]" used in an effort to persuade a decisive number of stockholders to shift their support to the Libel Defendants. *Greenbelt*, 398 U.S. at 14. The fourth factor favors the Libel Defendants.

On balance, the four factors strongly favor the Libel Defendants and defeat any reasonable inference that the average reader would regard the Looting Allegations as statements of fact. A stockholder reading the Fight Letter would anticipate exaggerated characterizations of the Libel Plaintiffs' tenure as directors given the contested election and the acrimonious relationship between the parties. It is not reasonably conceivable that a recipient of the Fight Letter would regard the Looting Allegations as anything other than an expression of the Libel Defendants' opinion.

## D.    The Concealment Allegations

The Libel Plaintiffs next contend that the Concealment Allegations were defamatory because they suggest that the Libel Plaintiffs were compelled to provide information and take other steps regarding the Company that they actually agreed to do

51

voluntarily. They focus on the statements that this court "ordered" the Libel Plaintiffs to provide books and records, "forced" the Libel Plaintiffs to hold the annual meeting, and entered a "restraining order prohibiting [the Libel Plaintiffs] from distributing any funds to preferred and common stock holders until the lawsuit in Delaware resolves the complaints." Compl. Ex. A, at 1-2. While conceding that court orders addressed each point, the Libel Plaintiffs complain that the statements are misleading because the orders were not entered over their objection, but rather as stipulated orders. Dkt. 189, at 32-33.

At common law, truth is an affirmative defense to a defamation action. *Marker v. Huang*, 610 A.2d 1341, 1350 (Del. 1992). In Delaware, it is sufficient that the statement is "substantially true." *Ramunno*, 705 A.2d at 1035. In language seized upon by the Libel Plaintiffs, the Delaware Supreme Court has cautioned against dismissing claims on the pleadings based on the defense of substantial truth: "[G]iven the unavoidably inferential nature of this inquiry, it is a rare case that may be dismissed under Rule 12(b)(6) on the rationale that the statements complained of are substantially true." *Id.* at 1036. That statement applies to dismissal of a defamation claim brought by a private plaintiff, where the defendant has the burden of establishing truth. *See id.* The statement accords with the general rule that "dismissal of [a] complaint based upon an affirmative defense is inappropriate."[25]

---

[25] *Reid v. Spazio*, 970 A.2d 176, 183-84 (Del. 2009); *see also Meades v. Wilm. Hous. Auth.*, 875 A.2d 632, 2005 WL 1131112, at *2 (Del. May 12, 2005) (TABLE) (reversing dismissal of defamation claim based on affirmative defense of conditional privilege).

Here, the Libel Plaintiffs are limited-purpose public figures, so they bear the burden of pleading falsity, *i.e.* that it is reasonably conceivable that the statements are not substantially true.[26] The Libel Plaintiffs have failed to meet their burden as to these statements because it is undisputed that this court entered orders requiring each of the acts at issue. Regardless of how the orders came into effect, the parties were obligated— or "forced"—to comply.

Moreover, the Libel Defendants' characterization is even more accurate considering the Libel Plaintiffs' conduct in this litigation. The Libel Plaintiffs opposed the Books and Records Action and the Meeting Action from the outset, and they contended in each that the petitioners were not entitled to any relief. In the Books and Records Action, the Libel Plaintiffs resisted producing documents, opting instead to dribble out materials and prompting the court (namely me) to comment: "It looks like [the Libel Plaintiffs] are doing the minimum possible to give yourself a colorable basis to argue that you've complied. I feel like I'm dealing with a teenager who is coming up with excuses." Dkt. 43, at 11. Particularly in light of this conduct, it is not reasonably conceivable that the Libel Plaintiffs could establish that the Fight Letter's statements about the orders were not substantially true.

The Libel Plaintiffs also challenge the statement in the Fight Letter that "the Court admonished them that they had to pay the accrued dividends and liquidation preference

---

[26] *Doe v. Cahill*, 884 A.2d at 463; *see also Ramada Inns, Inc. v. Dow Jones & Co., Inc.*, 543 A.2d 313, 318 (Del. Super. 1987) ("I am satisfied that the burden of proving falsity necessarily incorporates the burden of negating substantial truth.").

on preferred stock in liquidation." Compl. ¶ 34. The parties agree that this statement refers to an April 2014 teleconference in the Plenary Action. The Libel Plaintiffs contend that this statement is false because, in that teleconference, they agreed that the preferred stockholders were entitled to these payments. *See* Dkt. 6, at 14. Although that is true, the court (again me) admonished the Libel Plaintiffs all the same. I regarded it as "pretty obvious" that the preferred stockholders were entitled to these payments and noted based on my involvement in prolonged litigation involving the parties that the Company had a tendency to disregard basic principles of corporate law. Accordingly, I told both sides that "[p]eople need to run this on the up-and-up." I warned the Company, which was controlled at the time by the Libel Plaintiffs, "you better be complying scrupulously with what is in your charter documents and what this Court previously ruled. You better not be fooling around and you better not be pushing the envelope." *Id.* at 9. This was an admonition to the Libel Plaintiffs to cooperate fully on all of the matters presented by the litigation, including paying the preferred stockholders. It is not reasonably conceivable that Libel Plaintiffs could prove that the statement in the Fight Letter about this teleconference was not substantially true.

Finally, the Libel Plaintiffs point to a passage in the Fight Letter about litigation in Texas between the Company and its noteholders. It reads: "[T]he Company was forced kicking and screaming to settle. This loss shocked them to then change their plans and forced them to make payment on all the notes." Compl. Ex. A, at 1. The Libel Plaintiffs claim that this passage contains false statements because one cannot be "forced kicking

54

and screaming to settle," and the settlement was not a "loss" that "forced them to make payments." Compl. ¶ 40.

None of these statements are defamatory. The statement of being "forced kicking and screaming to settle" is indeed nonsensical, which is also why it would be understood by a reader as hyperbole and not literal truth. *See Bresler*, 398 U.S. at 14; *Riley*, 529 A.2d at 252. Calling the settlement a "loss" for the Company is a subjective assessment and protected opinion. And, as with the court orders, even though the outcome came about through a voluntary agreement, the consequence was that the Libel Plaintiffs were "forced" to make payments on the notes, which they previously had refused to make, but which they became obligated to make in the legally binding settlement agreement.

The Libel Plaintiffs thus fail to state a claim as to the Concealment Allegations. Given this ruling, this decision need not address the Libel Defendants' claim that the Concealment Allegations are nonactionable under the fair report privilege.

## E. The Payment Allegations

This leaves the Payment Allegations. The Libel Plaintiffs have stated a claim as to these statements.

The Payment Allegations encompass the statements in the Fight Letter to the effect that the Libel Plaintiffs would cause the Company to breach its contractual obligations. The following paragraph is illustrative:

> [The PSI Directors] were not going to pay what was owed on the notes. They were not going to pay the accrued dividends on preferred stock. They were not going to pay liquidation preference to outstanding preferred stock. They weren't going to pay anything on the GX License Claims. They reduced stock owned by individual that had been approved by the Court.

55

> How do we know this? Because they told us and even stated it in their own documents sent to some of you.

Compl. Ex. A, at 1 (emphasis added). A reader could interpret these statements as factual assertions about what the Libel Plaintiffs had told the Libel Defendants or set forth in their documents. The Libel Plaintiffs deny this, and it is reasonably conceivable at this stage of the case that the statements were false. It is also reasonably conceivable that the Libel Defendants knew the statements were false and hence acted with actual malice if, for example, the Libel Plaintiffs did not say these things or if their documents did not contain similar statements.

The Payment Allegations also encompass a statement in the Fight Letter that the PSI Directors had "tentative plans to merge [the Company] with either PSI, Smartcomm, and/or M2M and prolong[] any distributions to you." Compl. ¶ 46. A transaction with PSI, Smartcomm, or M2M would have been a related-party transaction.

The Libel Defendants have argued that this statement is substantially true and have submitted two exhibits as evidence. First, in April 2013 the Company's Board approved a $450,000 bonus for Knapp "on sale of the company or cumulative financing transactions greater than or equal to $10 million." Dkt. 185, Ex. U. Second, in a "Restated Repurchase Offer" in March 2015 the Company told its investors that "[i]n the event the Company is acquired by merger the purchaser could potentially offer a premium over the liquidation preferences and accrued dividends of the Preferred Stock." *Id.*, Ex. V. Assuming for the sake of argument that the court can consider these documents, they do not suggest that the Libel Plaintiffs were considering a related-party transaction or that the purpose of a

transaction was to "prolong[] any distributions" to the Company's investors. It is reasonably conceivable at this stage of the case that the statement in the Fight Letter was false and that the Libel Defendants knew it was false or acted with reckless disregard for the truth.

**F.     The Claims Against The Association And Its Individual Members**

The Libel Plaintiffs contend that the Association's individual members "may be sued and judgment may be taken against them through suit against [the Association] itself pursuant to 10 *Del. C.* § 3904." Compl. ¶ 5. The Libel Defendants concede that the suit is properly maintained against the Association as an entity, but argue that the members who did not sign the Fight Letter cannot be held individually liable. *See* Dkt. 166 at 87.

Under Delaware law,

> An unincorporated association of persons, including a partnership, using a common name may sue and be sued in such common name and a judgment recovered therein shall be a lien like other judgments, and may be executed upon by levy, seizure and sale of the personal and real estate of such association, and also that of the persons composing such association in the same manner with respect to them as if they had been made parties defendant by their individual names. Satisfaction thereof may also be obtained by attachment process.

10 *Del. C.* § 3904. "The basic purpose of [the statute] is to permit a noncorporate entity to sue, and be sued, in the name it presents to the public without the necessity of joining the various individuals who comprise the association."[27] The statute recognizes that a non-

---

[27] *Furek v. Univ. of Del.*, 594 A.2d 506, 513 (Del. 1991); *see also Marshall v. Univ. of Del.*, 1986 WL 11566, at *2 (Del. Super. Oct. 8, 1986): ("This statute . . . was . . . intended as a procedural device whereby a plaintiff wishing to sue the individual members of an unincorporated association could sue such members under a common

57

corporate entity "is a collection of persons. It is not an entity like a corporation which exists apart from people. Its membership does not share the insulation from personal liability as shareholders do." *State Farm Mut. Aut. Ins. Co. v. Harris*, 1996 WL 280770, at *3 (Del. Super. Mar. 18, 1996). "Thus, the association is its members, and the members are the association. Actions of the association are actions of its members, and if a dispute is with the association, then the dispute is with the individual members." *Potter v. Pilots' Ass'n for Bay River*, 1992 WL 114065, at *4 (Del. Super. May 6, 1992).

By statute, the Libel Plaintiffs are permitted to sue the Association under a common name. All members of the Association are potentially liable in the event the Libel Plaintiffs are entitled to recover.

## G.     Civil Conspiracy And Aiding And Abetting

Counts II and III of the Complaint seek to impose secondary liability for defamation on all defendants. Count II frames the basis for secondary liability in terms of civil conspiracy. Count III frames the basis for secondary liability in terms of aiding and abetting. The Libel Defendants moved to dismiss these counts only on one ground: they require an underlying tort, and the defamation claim could not survive a motion to dismiss. This decision has held that the Libel Plaintiffs stated a claim for defamation as to the Payment Allegations. Consequently, the theories of secondary liability survive the motion to dismiss as to those statements.

---

name rather than under each member's individual name. Thus, a plaintiff suing an unincorporated association under 10 *Del. C.* § 3904 is effectively suing both the association as an entity and the individual members of that association.").

### III. CONCLUSION

The Libel Plaintiffs' claims are not subject to Delaware's anti-SLAPP statute. The Libel Plaintiffs are, however, limited-purpose public figures. Many of the statements in the Fight Letter are not defamatory, either because they are substantially true or expressions of opinion. Nonetheless, the Libel Plaintiffs have successfully pled that the Payment Allegations are defamatory and conceivably made with actual malice. As to those statements, the motion to dismiss is denied. Otherwise, the motion to dismiss is granted.