# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TODD O'GARA and WANU WATER, INC., a Delaware corporation, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2018-0708-KSJM |
| SHELDON COLEMAN, SERGIO PEDREIRO, LINN EVANS, ADRIAN LEUENBERGER, GREEN LANTERN, L.P., a California limited partnership, GREEN LANTERN VENTURES, LLC, a California limited liability company, and LION CONSULTING GmbH, a Swiss corporation, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 14, 2019
Date Decided: February 14, 2020

Stephen C. Norman, Christopher N. Kelly, Tyler J. Leavengood, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; James Clough, SEYFARTH SHAW LLP, Los Angeles, California; William L. Prickett, Andrew T. Stark, SEYFARTH SHAW LLP, Boston, Massachusetts; *Counsel for Plaintiffs Todd O'Gara and Wanu Water, Inc.*

Kelly E. Farnan, Susan M. Hannigan, Anthony M. Calvano, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Bradley Chapin, RUTAN & TUCKER LLP, Costa Mesa, California; *Counsel for Defendants Sheldon Coleman, Green Lantern, L.P., and Green Lantern Ventures, LLC.*

**McCORMICK, V.C.**

The two plaintiffs are the founder of Wanu Water, Inc. ("Wanu") and Wanu itself. They allege that the defendants, former directors and current stockholders of Wanu, engaged in a conspiracy to seize control of Wanu by discrediting the founder and proposing a convertible note offering that would dilute the founder's interest. The founder, who controls a majority of Wanu's voting power, removed the directors from the board in response. He then deployed this litigation.

The complaint asserts claims for breach of fiduciary duty, tortious interference with business relations and contract, civil conspiracy, and libel. The plaintiffs settled with and dismissed four of the original defendants. The remaining three defendants, a former director and two non-Delaware entities through which he owns Wanu stock, have moved to dismiss the complaint. They argue that the complaint fails to state a claim and that the plaintiffs' conspiracy theory fails to establish personal jurisdiction over the non-Delaware entities.

This decision holds that the complaint fails to plead facts making it reasonably conceivable that essential elements of the claims against the former director are satisfied. Because the plaintiffs fail to plead the existence of a civil conspiracy, they may not rely on the conspiracy theory to establish jurisdiction over the non-Delaware entities. Accordingly, this decision grants the defendants' motion to dismiss.

1

## I. FACTUAL BACKGROUND

The background facts are drawn from the First Amended Verified Complaint (the "Amended Complaint") and documents it incorporates by reference, including letters and emails that it quotes.[1]

### A. O'Gara and Wanu

In 2010, Plaintiff Todd O'Gara founded Wanu (with O'Gara, "Plaintiffs"), a Delaware corporation based in California that produces nutrient-infused water. In 2014, O'Gara stepped down as CEO of Wanu but continued as Wanu's President, Chairman, and largest stockholder. In 2017, O'Gara executed voting agreements and irrevocable proxies with a number of Wanu stockholders (the "Voting Agreements"). Combined with his shares, the Voting Agreements gave O'Gara control over approximately fifty-two percent of the voting power in Wanu.

### B. The Board Investigates Allegations Against O'Gara.

In March 2018, a majority of Wanu's board of directors (the "Board") voted to remove Wanu's then-CEO, Steve Dollase. At the time, Sheldon Coleman, Sergio Pedreiro, Linn Evans, and Adrian Leuenberger (the "Director Defendants") served on the Board with O'Gara.

---

[1] C.A. No. 2018-0708-KSJM, Docket ("Dkt.") 50, First Am. Verified Compl. ("Am. Compl.").

In April 2018, Dollase and two Wanu stockholders, Jay Binkley and Greg Hunter, raised allegations against O'Gara. In an April 9, 2018, email exchange including Binkley, Hunter declared: "Operation 'gain leverage' commences."[2] The next day, Dollase emailed the Board blaming O'Gara for inhibiting Dollase's ability to perform as Wanu's CEO in a variety of ways. Dollase claimed that he had discovered an unauthorized certificate evidencing the issuance of several hundred thousand shares to O'Gara and that O'Gara's business expenses and spending were excessive and unsustainable.

In May 2018, Wanu engaged independent counsel to investigate Dollase's accusations against O'Gara. In July 2018, the investigation concluded and its findings were presented to the Board in a "Confidential Report of Independent Investigator" (the "Report").[3] The Report found that: Dollase was informed or had the ability to be informed about many of the issues he complained about in his email; Dollase's allegations were partly motivated by his dislike of O'Gara's management style and personality; Dollase was generally not well liked as a leader; and Dollase's management style created tension in the office. Plaintiffs allege "[u]pon information and belief" that Coleman shared the contents of the Report with Hunter and Binkley.[4]

---

[2] *Id.* ¶ 56.

[3] Dkt. 59, Transmittal Aff. of Anthony M. Calvano, Esq. in Supp. of the Opening Br. in Supp. of Defs.' Mot. to Dismiss the First Am. Verified Compl. ("Calvano Aff.") Ex. B.

[4] Am. Compl. ¶ 66.

After the Report issued, the Dollase faction raised another set of allegations against O'Gara. On August 3, 2018, Hunter and Binkley alleged that O'Gara made misstatements about his educational background in various documents prepared for prospective investors in 2014 and 2015. Hunter emailed the Board a lengthy list of questions pertaining to O'Gara's educational background and other alleged wrongdoing by O'Gara (the "August 3 Email"). The same day, Binkley recommended that Wanu retain another independent investigator to examine O'Gara's educational background. At some point, the Board authorized the independent investigator to commence this investigation (the "Background Investigation"). Communications between Binkley and Hunter after the August 3 Email suggest that their email campaign was motivated to some degree by their desire to be placed on the Wanu board.[5]

On August 21, 2018, the independent investigator provided a summary of his Background Investigation.[6] That summary stated that the investigator was unable to

---

[5] *See id.* ¶ 75 (Binkley emailing Hunter that the pair "should be rewarded in some way for all of this heavy lifting" if the independent investigator confirmed their suspicions concerning O'Gara); *id.* (Hunter replying that "[i]deally we can get board seats in the new world . . . assuming we are victorious in our information Quest, it will be a complete firestorm for [O'Gara]" (emphasis removed)).

[6] Calvano Aff. Ex. C.

confirm that O'Gara had in fact received degrees from the various educational institutions he claimed to have attended.[7]

### C. The Board Proposes a Financing Transaction, Which Is Never Consummated.

By August 2018, Wanu was in "dire need of cash."[8] O'Gara and the Director Defendants agreed that Wanu needed to raise capital urgently, but they disagreed as to the "form, structure, and terms of the capital raise."[9] Coleman and other members of the Board proposed a financing transaction whereby Wanu would issue convertible notes with a conversion price of $0.40 per share if another round of financing did not occur. O'Gara opposed this plan, which would dilute his voting power. He also alleges that the proposed $0.40 conversion price implied a pre-money valuation of approximately $12.7 million.[10] Only a year prior, however, third-parties invested in Wanu at $1.25 per share, which represented a post-money valuation of approximately $40 million. O'Gara thus believed that the proposed financing was priced at a "massive discount."[11] O'Gara concluded that the deal was

---

[7] *Id.* at 4–5.

[8] Am. Compl. ¶ 79.

[9] *Id.* ¶ 80.

[10] *Id.* ¶ 90.

[11] *Id.* ¶ 82.

5

designed to "allow the [Director Defendants] to acquire Wanu shares" at the allegedly discounted price.[12]

Board deliberations concerning the proposed financing transaction occurred around the time of the Background Investigation. Thus, the Director Defendants demanded as a condition to the proposed note financing that O'Gara agree to "a broad release of potential claims against the Company . . . , invention assignments, and a 'disclosure' regarding previous errors related to his education background in prior offering documents."[13] O'Gara refused. The financing transaction was not approved or consummated.[14]

### D.   O'Gara Removes Three of the Director Defendants From the Board.

In the wake of the Board's disagreement on the proposed financing transaction, tensions between Coleman and O'Gara escalated. On August 22, 2018, Coleman emailed O'Gara and the full Board (the "August 22 Email"), calling on O'Gara to "step aside from all operations of Wanu, relinquish his seat on the Board and agree to waive his right to elect five of the seven members of the Board."[15]

---

[12] *Id.*

[13] *Id.* ¶ 95.

[14] According to Plaintiffs, O'Gara was able to secure "$1 million in new capital, staving off the immediate need for the convertible note offering or any other urgent cash raise." *Id.* ¶ 103.

[15] *Id.* ¶ 99.

6

On August 23, 2018, Hunter emailed the Board and numerous stockholders again raising allegations concerning O'Gara's educational background and performance and complaints concerning the Board's lack of responsiveness. Coleman responded to Hunter's email, copying the Board:

> We share your concerns about responsiveness. Given that, it shouldn't surprise you that the Board is working hard to resolve the credentialing issue, make leadership and governance changes, and prepare disclosures—all with the goal of attempting to help the company succeed, including accessing new funding with transparency and urgency. We think of the process as a comprehensive professionalization of Wanu.[16]

On August 24, 2018, the Director Defendants noticed a special Board meeting for August 27, 2018, and set agenda items related to "[p]roposals regarding corporate governance."[17] Before the meeting, believing that the Director Defendants "had now gone rogue and were attempting to seize control," O'Gara executed a written consent removing Coleman, Evans, and Pedreiro from the Board and designating non-parties Nicole McMackin, Rich Pascucci, and Bruce Cassidy to fill the vacant seats.

### E. O'Gara's Actions Draw Further Criticism.

O'Gara's removal of the Director Defendants drew additional criticism from Hunter and Binkley. On the same day that O'Gara removed the Director Defendants, Hunter emailed two of the new directors, McMackin and Cassidy, to make them

---

[16] *Id.* ¶ 102.

[17] *Id.* ¶ 104.

7

aware of the previously raised accusations concerning O'Gara. Hunter forwarded the Background Investigation summary and the August 3 Email to them. Later, on August 29, 2018, Hunter forwarded his communications with McMackin and Cassidy to some of the Director Defendants, including Coleman.

On September 5, 2018, Hunter sent an email to "most or all" Wanu stockholders, drawing attention to "potential alleged misuse of shareholder capital . . . , abuse of governance matters and fraudulent issuance of shares."[18] The email attached a copy of the Voting Agreements and cautioned stockholders: "If you receive a copy of the attached document, . . . please take the time to run it by your attorney. Signing it means that you forever give up your earned and paid for right to vote . . . . Just be careful!"[19]

On September 12, 2018, counsel for Coleman and the two entities through which Coleman holds Wanu stock, Green Lantern, L.P. and Green Lantern Ventures, LLC (collectively, "Green Lantern"), sent a letter to O'Gara's counsel (the "September 12 Letter"). The letter "address[ed] a host of . . . issues that have recently come to light regarding Mr. O'Gara's inexplicable and extremely concerning conduct to the detriment of the Company and its numerous investors and

---

[18] *Id.* ¶¶ 119, 120.

[19] *Id.* ¶ 123.

8

stockholders."[20]  The letter demanded that O'Gara "immediately resign as a Director and Officer of the Company."[21]

On September 14, 2018, the Director Defendants issued a letter addressed to "fellow Wanu stockholders" (the "September 14 Letter"), asking Wanu stockholders to review the September 12 Letter, which they explained detailed "extremely serious Todd O'Gara improprieties."[22]  The September 14 Letter then laid out an "action plan" and suggested that stockholders "contact Mr. O'Gara in writing, and ask him to explain his actions."  It concluded: "If you feel as we do, ask him to step aside."[23]

On September 15, 2018, several "Concerned Wanu Shareholders" sent an email (the "September 15 Email") to all Wanu stockholders, enclosing the September 12 Letter and the September 14 Letter.  The September 15 Email stated that Wanu "needs a significant reset, both in operational leadership and governance. . . . [A]ction is needed."[24]  The email was sent on behalf of the Director Defendants, Green Lantern, and the entity through which Leuenberger owned Wanu stock, Lion Consulting GmbH ("Lion").

---

[20] *Id.* ¶ 111; Calvano Aff. Ex. H.

[21] Calvano Aff. Ex. H, at 2.

[22] Am. Compl. ¶ 129; Calvano Aff. Ex. G.

[23] Calvano Aff. Ex. G, at 1.

[24] Am. Compl. ¶ 133.

On September 22, 2018, Hunter sent another email to all Wanu stockholders and directors (the "September 22 Email"), again raising concerns about O'Gara's educational background and management of Wanu. In that email, Hunter questioned McMackin, Pascucci, and Cassidy's "conspicuous[]" silence and urged them to "be independent and working for ALL the shareholders."[25] On the same day, Hunter sent a follow-up email to Wanu stockholders attaching the directors' contact information and encouraging stockholders to inquire about the authenticity of the Voting Agreements.

On September 27, 2018, O'Gara sent a letter to all Wanu stockholders (the "September 27 Letter"), addressing the various allegations made against him by Hunter, Binkley, and the Director Defendants.[26]

### F. This Litigation

Plaintiffs commenced this litigation on September 28, 2018. In the initial complaint, Plaintiffs named as defendants the Director Defendants, Green Lantern, and Lion, among others.[27] Plaintiffs amended their complaint on April 26, 2019, and

---

[25] *Id.* ¶ 145.

[26] *Id.* ¶ 138; Calvano Aff. Ex. D.

[27] The initial complaint also named three other Wanu stockholders as defendants, but Plaintiffs stipulated to dismissing claims against them on January 21, 2019. Dkt. 35, Stipulation and Order of Dismissal.

subsequently stipulated to dismiss claims against Pedreiro, Leuenberger, Evans, and Lion pursuant to a settlement agreement reached with those parties.[28]

As to the remaining defendants, Coleman and Green Lantern ("Defendants"), the Amended Complaint asserts six Counts:

- Count One for breach of fiduciary duty against Coleman;

- Count Two for tortious interference with business relations against Coleman and Green Lantern;

- Count Three for tortious interference with contract against Coleman and Green Lantern;

- Count Four for libel against Coleman and Green Lantern;

- Count Five for civil conspiracy against Coleman and Green Lantern;

- Count Six for declaratory judgment that Coleman was properly removed from the Board.

Coleman and Green Lantern filed a motion to dismiss the Amended Complaint on June 7, 2019.[29] The parties fully briefed the motion.[30] In briefing, Defendants

---

[28] Dkt. 56, Stipulation and Order of Dismissal.

[29] Dkt. 57, Defs.' Mot. to Dismiss the First Am. Verified Compl.

[30] Dkt. 58, Opening Br. in Supp. of Defs.' Mot. to Dismiss the First Am. Verified Compl. ("Defs.' Opening Br."); Dkt. 62, Pls. Todd O'Gara and Wanu Water, Inc.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Answering Br."); Dkt. 66, Reply Br. in Further Supp. of Defs.' Mot. to Dismiss the First Am. Verified Compl.

11

mooted Count Six.[31]  The Court heard oral arguments as to the remaining claims on November 14, 2019.[32]

## II.  LEGAL ANALYSIS

Defendants have moved to dismiss the Amended Complaint pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim, and Green Lantern has moved to dismiss the Amended Complaint pursuant to Court of Chancery Rule 12(b)(2) for lack of personal jurisdiction.

### A.  The Amended Complaint Fails to State Claims Against Coleman.

As discussed below, because the Amended Complaint fails to state a claim of civil conspiracy, the Court lacks personal jurisdiction over Green Lantern.  The Court thus focuses the Rule 12(b)(6) analysis on Plaintiffs' claims against Coleman.

Under Rule 12(b)(6), the Court may grant a motion to dismiss if the complaint "fail[s] to state a claim upon which relief can be granted."[33]  "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[34]  When considering such a motion, the Court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable

---

[31] Defendants represent in briefing that "Defendants no longer assert the right for Coleman to remain on the Board."  Defs.' Opening Br. at 62.

[32] Dkt. 75, Tr. of the Oral Arg. on Defs.' Mot. to Dismiss.

[33] Ct. Ch. R. 12(b)(6).

[34] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

12

inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[35] The reasonable conceivability standard asks whether there is a possibility of recovery.[36] The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[37]

This analysis turns first to the claim at the heart of this case—Plaintiffs' claim of civil conspiracy—before addressing the merits of Plaintiffs' other claims.

### 1. The Amended Complaint Fails to State a Claim for Conspiracy.

Count Five of the Amended Complaint alleges that Coleman and Green Lantern engaged in a conspiracy with the other Director Defendants, Hunter, Binkley, "and/or" Dollase.[38] "Under Delaware law, to state a claim for civil conspiracy, a plaintiff must plead facts supporting (1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was

---

[35] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[36] *Id.* at 537 n.13.

[37] *Price v. E.I. du Pont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[38] Am. Compl. ¶ 185.

done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff."[39]

In an effort to state a claim for civil conspiracy, the Amended Complaint identifies a number of communications sent in August and September 2018, in which Coleman and others criticized or raised concerns regarding O'Gara. In an August 22 Email, Coleman called on O'Gara to "step aside from all operations of Wanu, relinquish his seat on the Board and agree to waive his right to elect five of the seven members of the Board."[40] The next day, Coleman emailed Hunter and Binkley, copying the Board, and expressed the Board's determination to resolve issues arising from O'Gara's perceived misconduct "with the goal of attempting to help the company succeed."[41] On August 29, Hunter forwarded several of his emails sent to the new directors on to Coleman and others, but the Amended Complaint does not allege that Coleman replied or otherwise responded to those emails.[42] Plaintiffs further point to the September 12 Letter and the September 15 Email, both of which were signed by Coleman and Green Lantern, but neither of which were signed by Hunter or Binkley.

---

[39] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006) (citing *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149–50 (Del.1987)).

[40] Am. Compl. ¶ 99.

[41] *Id.* ¶ 102.

[42] *Id.* ¶ 115.

14

These allegations do not supply a reasonably conceivable basis for the Court to infer the existence of a conspiracy involving Coleman. Rather, they support a reasonable inference that Coleman, Hunter, and Binkley shared significant concerns regarding O'Gara's leadership and the implications that his perceived misconduct would have for Wanu. Coleman expressed these concerns as a director and through Green Lantern as a stockholder. The fact that Coleman, Hunter, and Binkley communicated about those concerns does not support the existence of an agreement among them, let alone a conspiratorial one. Plaintiffs' allegation that Coleman acted "by agreement and in concert" with Hunter and Binkley "based on the email communications among the co-conspirators" is conclusory and unsupported by well-pleaded facts in the Amended Complaint.[43]

The Amended Complaint also makes several allegations "upon information and belief" to link Coleman, Hunter, and Binkley in an alleged conspiracy. The Amended Complaint alleges that, "[u]pon information and belief," Coleman shared the Confidential Report with Hunter and Binkley.[44] The Amended Complaint further alleges that on August 27, shortly after O'Gara had removed three of the

---

[43] *Id.* ¶ 153; *see also id.* ¶ 142 ("Based on the email communications between them, Hunter reengaged in his campaign with the knowledge, approval, and encouragement of Coleman . . . ."); *id* ¶ 185 ("Based on the emails among them, at least the Defendants, Hunter, Binkley and/or upon information and belief, Dollase agreed, conspired, and acted in concert . . . .").

[44] *Id.* ¶ 66.

15

Director Defendants from the Board and that "[u]pon information and belief," Coleman informed Hunter and "perhaps one or more other[s]" of that fact.[45] Neither allegation is supported by or inferred from well-pleaded facts in the Amended Complaint, and the Court thus need not accept them as true.[46]

### 2. The Amended Complaint Fails to State a Claim for Breach of Fiduciary Duty.

Count One of the Amended Complaint alleges that Coleman breached his fiduciary duty of loyalty[47] to Wanu in two ways: first, when proposing the convertible note financing, and second, when communicating with stockholders concerning O'Gara's conduct.[48] "A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."[49] It is undisputed that Coleman owed fiduciary duties as a director of

---

[45] *Id.* ¶ 107.

[46] *See, e.g.*, *Griffin Corp. Servs., LLC v. Jacobs*, 2005 WL 2000775, at *6 (Del. Ch. Aug. 11, 2005) (addressing one of the plaintiffs' allegations made only "[u]pon information and belief" and concluding that "[s]uch a bald statement, without further factual allegations to support it, is merely conclusory and need not be accepted as true" (citing *Haber v. Bell,* 465 A.2d 353, 357 (Del. Ch. 1983)).

[47] Plaintiffs do not assert a claim for breach of the duty of care in light of Wanu's exculpatory charter provision. Pls.' Answering Br. at 25 n.5.

[48] Am. Compl. ¶ 156. Plaintiffs argue that Coleman owed a continuing fiduciary duty to Wanu after his removal in August 2018, but they do not meaningfully develop this theory. Because the Court finds no reasonably conceivable basis to infer that Coleman's conduct constituted a breach of fiduciary duty at any time, this decision does not address this issue.

[49] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010) (citing *ZRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009)).

16

Wanu. Where, as here, the complaint alleges that a director breached his fiduciary duty of loyalty, "a plaintiff can survive a motion to dismiss . . . by pleading facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests . . . or acted in bad faith."[50] Bad faith may be demonstrated where "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[51]

As to the unconsummated financing transaction, Plaintiffs' theory is that Coleman harbored a self-interest adverse to other stockholders' interests when proposing the transaction.[52] According to Plaintiffs, Coleman designed the transaction to "drive down the value of Wanu" so that Coleman "could acquire more shares at an artificial discount" during or after the transaction.[53]

---

[50] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015).

[51] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369 (Del. 2006) (quoting *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 67 (Del. 2006)).

[52] Plaintiffs do not meaningfully attempt to argue that Coleman acted otherwise disloyally or in bad faith. *See* Pls.' Answering Br. at 27–30. The Amended Complaint does not plead facts sufficient to demonstrate a reasonably conceivable basis that Coleman was "motivated by an actual intent to do harm" or the "intent to violate applicable positive law." *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64, 67 (Del. 2006). Nor does it plead facts making it reasonably conceivable that Coleman "intentionally fail[ed] to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Id.* at 67.

[53] Pls.' Answering Br. at 29.

17

Because the Amended Complaint alleges that two large Wanu investors bought Company stock at a $1.25 per share valuation approximately one year prior to Coleman's proposal of the financing transaction, it is reasonably conceivable that the $0.40 per share price undervalued Wanu. But this is the only reasonable inference that can be drawn in support of Plaintiffs' theory, and it is not enough to support Plaintiffs' claim. The Amended Complaint is devoid of non-conclusory allegations concerning Coleman's alleged self-interest. It fails to plead facts demonstrating that Coleman desired to benefit from the proposed financing transaction.[54] It lacks any allegation that Coleman desired to acquire more stock. It provides no reason for inferring that Coleman would intentionally act to harm the value of his pre-existing interests in Wanu.

Moreover, the Amended Complaint alleges that the Board proposed the convertible note financing in light of Wanu's "urgent need to raise funds,"[55] and that O'Gara and the Director Defendants agreed that a capital raise was necessary, but that "they were not aligned on the form, structure, or terms of [that] capital raise."[56] Coleman's disagreement with O'Gara does not support a reasonable inference that Coleman was disloyal to Wanu or its stockholders. To the contrary, a board of

---

[54] *In re Cornerstone*, 115 A.3d at 1179–80.

[55] Am. Compl. ¶¶ 79, 80.

[56] *Id.* ¶ 80.

18

directors is a deliberative body,[57] and disagreements at the board level are a symptom and common byproduct of a healthy deliberative process.[58]

Plaintiffs' claim that Coleman acted disloyally when communicating with Wanu stockholders is similarly lacking. Plaintiffs argue that the "numerous

---

[57] *See OptimisCorp v. Waite*, 137 A.3d 970, 2016 WL 2585871, at *3 (Del. 2016) (TABLE) ("[I]t has long been the policy of our law to value the collaboration that comes when the entire board deliberates on corporate action . . . ." (first citing *Lippman v. Kehoe Stenograph Co.*, 95 A. 895, 899 (1915); then citing *Hall v. Search Capital Gp., Inc.*, 1996 WL 696921, at *2 (Del. Ch. Nov. 15, 1996); and then citing J. Travis Laster, John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 36–37 (2014))); *Disney v. Walt Disney Co.*, 2005 WL 1538336, at *4 (Del. Ch. June 20, 2005) (stating that "[a]t the foundation of Delaware General Corporation Law is the presumption that, in making a business decision, the directors of a corporation acted on an informed basis, in good faith, an in the honest belief that the action taken was in the best interests of the Company and that, absent an abuse of discretion, the courts will respect that judgment. Concomitant to that grant of deference to the directors of a corporation is the need to allow the directors the ability to deliberate openly and candidly with each other." (citations omitted)).

[58] Disagreement is the opposite of "monolithic . . . groupthink, within which no good faith back-and-forth exists," and which does "little to breed respect for director decision-making." *Appel v. Berkman*, 180 A.3d 1055, 1062 (Del. 2018). *See generally* Irving Janis, *Groupthink*, Psychol. Today Mag., Nov. 1971, at 84 (coining the term "groupthink" to describe the "mode of thinking that persons engage in when concurrence-seeking becomes so dominant in a cohesive ingroup that it tends to override realistic appraisal of alternative courses of action"); J. Travis Laster, *Cognitive Bias in Director Decision-Making*, 20 Corp. Governance Advisor 1, 5 (2012) ("Groupthink is the most important bias for boards of directors to watch for. People inherently desire harmony and tend to avoid speaking out. No one likes to make waves in a group."); M.M. Scharff, *Understanding WorldCom's Accounting Fraud: Did Groupthink Play a Role?*, 11 J. Leadership & Org. Stud. 109, 110 (2005) ("Groupthink . . . may help explain many of the issues and fraudulent activities at Worldcom . . . ."); Marleen A. O'Connor, *The Enron Board: The Perils of Groupthink*, 71 U. Cin. L. Rev. 1233, 1239 (2003) ("With an understanding of groupthink, we can see that the Enron Board did not prevent the Enron debacle because of psychological processes that lead cohesive boards to avoid seriously scrutinizing managerial policy."). These and other ex post studies of corporate disasters have led a number of commentators to suggest strategies for avoiding the perils of groupthink in and outside of the boardroom. *See, e.g.*, Cass R. Sunstein & Reid Hastie, *Making Dumb Groups Smarter*, Harv. Bus. Rev., Dec. 2014, at 97–98.

harassing and disparaging communications sent by [Coleman's] co-conspirators" can be attributed to Coleman based on the "well-established principle that 'one co-conspirator's acts are attributable to the other conspirators.'"[59] The Court has already found that Plaintiffs have failed to adequately plead the existence of a conspiracy. There are thus no adequately alleged "co-conspirators" whose conduct may be attributed to Coleman.

To the extent Plaintiffs argue that Coleman breached his fiduciary duty when he (1) emailed O'Gara about the "crisis of confidence" his perceived misconduct had caused investors,[60] or (2) emailed Hunter and Binkley about the Board's determination to resolve issues arising from O'Gara's perceived misconduct "with the goal of attempting to help the company succeed,"[61] those arguments are also without merit. These allegations do not make it reasonably conceivable that Coleman acted in bad faith or otherwise breached his fiduciary duties. Rather, they reflect a fiduciary's concern for Wanu's future in light of another fiduciary's perceived misconduct.

---

[59] Pls.' Answering Br. at 30.

[60] Am. Compl. ¶ 99.

[61] *Id.* ¶ 102.

### 3. The Amended Complaint Fails to State a Claim for Tortious Interference with Business Relations.

Count Two alleges that Coleman tortiously interfered with Plaintiffs' business relations by causing Wanu stockholders to decide not to make any further investments in Wanu.[62] "To survive dismissal, a claim for tortious interference with business relations must allege: '(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages.'"[63]

Plaintiffs' claim fails on the first element. "To meet the reasonable probability of a business opportunity prong, a plaintiff 'must identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant . . . .'"[64] The plaintiff "cannot rely on generalized allegations of harm."[65] "Furthermore, '[t]o be reasonably probable, a business opportunity must

---

[62] *Id.* ¶¶ 152, 168. In the Amended Complaint, Plaintiffs also allege that Defendants are liable for tortious interference with business relations because they "induc[ed] stockholders to breach their Voting Agreements with O'Gara or to not enter into similar agreements with O'Gara in the future." *Id.* ¶ 165. But Plaintiffs appear to abandon this argument in briefing, and they have thus waived it. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[63] *Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001) (quoting *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981)).

[64] *Soterion Corp. v. Soteria Mezzanine Corp.*, 2012 WL 5378251, at *13 (Del. Ch. Oct. 31, 2012) (quoting *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009)).

[65] *Id.* (quoting *Agilent*, 2009 WL 119865, at *7).

be something more than a mere hope . . . or a mere perception of a prospective business relationship.'"[66]

Plaintiffs allege that the first element of the test is satisfied because four "major Wanu stockholders" decided not to "make any further . . . investments" as a result of Defendants' conduct.[67] But Plaintiffs plead no facts suggesting that the four Wanu stockholders identified in the Amended Complaint were reasonably expected to make another investment in Wanu. And a stockholder's mere status as a stockholder does not, standing alone, allow the Court to reasonably infer that Wanu had anything more than "a mere hope . . . or a mere perception of a prospective business relationship" with that stockholder.[68] Plaintiffs thus fail to plead an essential element of Count Two.

### 4. The Amended Complaint Fails to State a Claim for Tortious Interference with Contract.

Count Three alleges that Coleman tortiously interfered with various contracts to which one or both Plaintiffs were party. "Under Delaware law, the elements of a claim for tortious interference with a contract are: '(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the

---

[66] *Id.* (quoting *Agilent*, 2009 WL 119865, at *7).

[67] Am. Compl. ¶ 152; Pls.' Answering Br. at 33–34.

[68] *Soterion*, 2012 WL 5378251, at *13 (quoting *Agilent*, 2009 WL 119865, at *7).

breach of such contract, (4) without justification, (5) which causes injury.'"[69] Plaintiffs fail to plead a number of these essential elements.

Plaintiffs' primary problem is that they have trouble identifying an agreement sufficient to support the first element. Plaintiffs first allege that "several prospective business partners have not entered into agreements with Wanu as a result of the disruption caused by Defendants' unlawful acts."[70] Yet if this allegation were accepted as true, then it would also be true that there were no agreements in the first place. Plaintiffs further allege that certain investors agreed to invest in Wanu, but then did not follow through with the investment.[71] Yet Plaintiffs do not allege the identities of the investors, the dates of the alleged agreements, or the terms of the alleged agreements. Even assuming that Plaintiffs' conclusory allegations sufficed to support the first element, Plaintiffs fails to meet the second element, because the Amended Complaint is devoid of any allegation that Coleman had knowledge of these alleged agreements.

Plaintiffs additionally allege that Coleman tortiously interfered with the Voting Agreements. Even assuming that Coleman committed "an intentional act"

---

[69] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987)).

[70] Am. Compl. ¶ 175.

[71] *Id.* (alleging that "investors who had agreed to invest in Wanu have not followed through with those investments because of the Defendants' conduct").

designed to interfere with the Voting Agreements, Plaintiffs have failed to allege any breach of the Voting Agreements. There can be no tortious interference with contract where the underlying contract has not been breached.[72]

### 5. The Amended Complaint Fails to State a Claim for Libel.

Count Four alleges that Coleman committed libel by "publish[ing] numerous scurrilous, false, and defamatory statements" concerning O'Gara's educational background and O'Gara's conduct in connection with corporate governance and operational matters.[73] "To state a claim for defamation, a plaintiff must plead (i) the defendant made a defamatory statement, (ii) concerning the plaintiff, (iii) the statement was published, and (iv) a third party would understand the character of the communication as defamatory."[74]

Additionally, a plaintiff must satisfy a "heightened pleading standard" if the plaintiff is a public figure.[75] This is because "[t]he law of libel enjoys a constitutional grounding" designed to provide "'breathing space' for the exercise of First Amendment rights."[76] Whether a plaintiff is a public figure is a question of law, and

---

[72] *Allied Capital*, 910 A.2d at 1036 ("To state a tortious interference claim, a plaintiff must properly allege an underlying breach of contract." (citations omitted)).

[73] Am. Compl. ¶ 180.

[74] *Agar v. Judy*, 151 A.3d 456, 470 (Del. Ch. 2017) (citing *Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005)).

[75] *Id.* at 477.

[76] *Id.* (first quoting *Ramunno v. Cawley*, 705 A.2d 1029, 1035 (Del. 1998); then quoting *New York Times v. Sullivan*, 376 U.S. 254, 298 (1964)).

24

the answer "is no exact science."[77] "There are two types of public figures: all-purpose and limited-purpose."[78] A limited-purpose public figure is "an individual [who] voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."[79] If the plaintiff is a public figure, the plaintiff must establish two additional elements to prevail on a libel claim: (i) that the statements are false; and (ii) that the statements were made with actual malice.[80]

The best method to determine whether an individual is a public figure "is to consider the rationale for recognizing public-figure status and then to determine whether it applies to the facts of the case."[81] The rationale is two-fold:

> First, "public figures are less vulnerable to injury from defamatory statements" because of "greater access . . . to channels of effective communication, which enable them through discussion to counter criticism and expose the falsehood and fallacies of defamatory statements." Second, "public figures are less deserving of protection than private persons because public figures, like public officials, have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them."[82]

---

[77] *Id.* (citing Rodney A. Smolla, 2 Law of Defamation § 2:55 (2d ed. 2016)).

[78] *Id.*

[79] *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 478 U.S. 323, 351 (1974)).

[80] *Id.*

[81] *Id.* at 478.

[82] *Id.* (citing *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 164 (1979)).

In this case, both rationales for recognizing public-figure status apply.[83] *First*, as Board Chairman and President of Wanu, O'Gara had "greater access . . . to channels of effective communication" that allowed him to counter criticism by the Board and other stockholders and debunk any statements he viewed to be false.[84] O'Gara in fact used those "channels of effective communication" in the September 27 Letter, which he printed on official Company letterhead and addressed to all Wanu stockholders. In that letter, O'Gara explained:

> Over the past month or so, a myriad of allegations by certain shareholders has taken place that created unnecessary distraction in the day-to-day operation of our company, casting doubt over whether we would be able to survive. In light of these events and with the hopes to create a more cooperative environment at [W]anu, please allow me to address you all and clear the air.[85]

As a director of Wanu, O'Gara "ha[s] access to internal corporate information [he] could use to respond to any allegations of misconduct."[86] And in the September 17

---

[83] Plaintiffs cite several non-Delaware authorities for the proposition that O'Gara cannot be a public figure because the allegedly defamatory statements were "not part of a public controversy" that was "debated publicly." Pls.' Answering Br. at 42. This argument ignores Delaware law, as summarized in *Agar*, which counsels the Court "to consider the rationale for recognizing public-figure status and then to determine whether it applies to the facts of the case." *Agar*, 151 A.3d at 478.

[84] *Agar*, 151 A.3d at 478 (citing *Wolston*, 443 U.S. at 164).

[85] Calvano Aff. Ex. D, at 1.

[86] *Agar*, 151 A.3d at 480.

Letter, O'Gara expressly referred to information that only a corporate insider would have.[87]

*Second*, by taking office as a director of Wanu, O'Gara "voluntarily assumed [a] role[] in which [he] knowingly ran 'the risk of closer public scrutiny.'"[88] As former Chief Justice Strine observed while serving as Vice Chancellor, "corporate officers 'should expect to endure publicity.'"[89] By assuming the roles of Board Chairman and President of Wanu, O'Gara became the "steward[] of an entity in

---

[87] Plaintiffs argue that the first rationale does not apply because "O'Gara did not have 'greater access' than Defendants to channels of effective communication." Pls.' Answering Br. at 46. But it matters not whether O'Gara had greater access *than Defendants* to channels of effective communication. Public figures are less vulnerable *than private figures* "because of their ability to resort to effective 'self-help.'" *Wolston*, 443 U.S. at 164; *see Gertz*, 478 U.S. at 344 ("Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements *than private individuals normally enjoy*." (emphasis added)). Thus, the relevant inquiry is whether O'Gara had greater access to channels of effective communication *than a private figure would* in order to address or debunk any alleged falsehoods.

[88] *Agar*, 151 A.3d at 479 (quoting *Gertz*, 478 U.S. at 344). Plaintiffs argue that the second rationale "indicates O'Gara is a private figure" because he is "simply founder, President, and Chairman of a private start-up company" and thus does not face public scrutiny. Pls.' Answering Br. at 47. Plaintiffs' argument makes a distinction without a difference. The fact that the company in question is closely held does not reduce a director's voluntary exposure to public scrutiny by the company's stockholders. O'Gara is a public figure "within the limited community of the Company's investors." *Id.* at 480; *see id.* at 479 (considering a libel claim asserted by former directors of a closely held company and holding that, "[w]hen individuals seek to serve as directors of an organization, they meet the second rationale for public figure status" because they "voluntarily assume[] roles in which they knowingly r[un] the risk of closer public scrutiny" (internal quotation marks and citations omitted)).

[89] *Id.* (quoting *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *49 (Del. Ch. July 12, 2010)).

which the investors had a 'justified and important interest.'"[90]   Thus, O'Gara's conduct while in office and pertaining to matters of corporate interest exposed him to an "increased risk of injury from defamatory falsehood."[91]

In this case, the allegedly defamatory statements were made amongst stockholders concerning O'Gara's continued tenure as Board Chairman and President of Wanu in light of certain perceived misconduct.[92]   In view of the foregoing principles, O'Gara is a public figure for the limited purpose of criticism and commentary concerning his official conduct amongst stockholders of Wanu.

Because O'Gara is a limited-purpose public figure, the heightened pleading standard applies, and Plaintiffs must adequately plead falsity and actual malice. Plaintiffs' claim fails because they have failed to adequately plead actual malice with respect to certain allegedly defamatory statements and falsity as to others.

A statement is made with actual malice when "the maker knew the statement was false or acted with reckless disregard for the truth."[93]   Plaintiffs point to six paragraphs of the Amended Complaint, which they say adequately allege that

---

[90] *Id.* at 480 (quoting *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 134 (1967)).

[91] *Id.* at 478 (citing *Wolston*, 443 U.S. at 164).

[92] Plaintiffs argue that O'Gara did not voluntarily inject himself into the controversy that Defendants allegedly "manufactured." Pls.' Answering Br. at 43. This argument misses the point. As discussed above, Delaware courts apply the two rationales underlying the recognition of public-figure status on a case-by-case basis; here, both of those rationales apply. *Agar*, 151 A.3d at 478.

[93] *Agar*, 151 A.3d at 477 (citing *Doe*, 884 A.2d at 463).

Coleman acted with actual malice.[94] Three of those paragraphs address communications made by Hunter,[95] which are not attributable to Coleman under Plaintiffs' failed conspiracy theory. The remaining three paragraphs contain allegations that are conclusory in nature, and the Court need not accept them as true.[96]

In paragraph 129 of the Amended Complaint, Plaintiffs allege that Coleman "knew, or w[as] reckless in not knowing" that the "extremely serious Todd O'Gara improprieties" referred to in the September 14 Letter were "either false or misleadingly complete and thus defamatory of O'Gara."[97] The Amended Complaint provides no factual support for this conclusory allegation.

In paragraph 137 of the Amended Complaint, Plaintiffs allege that "the Defendants knew full well, based on their close familiarity with the Company's

---

[94] Pls.' Answering Br. at 53–54.

[95] Am. Compl. ¶ 120 (describing an email sent by Hunter on September 5, 2018 and stating that "Hunter either knew, or should have known that such allegations were false"); *id.* ¶ 127 ("To the extent Hunter and the Individual Defendants did not know that any of their representations were false *when Hunter made them* . . . , they were made recklessly and without regard for their truth." (emphasis added)); *id.* ¶ 143 (describing the September 22 Email, sent by Hunter only, and stating that the "Defendants were fully aware" that the allegations contained therein were meritless).

[96] With the exception of the argument that Coleman acted with actual malice by making statements based on the Background Investigation summary, *see infra* notes 100 & 101 and accompanying text, this analysis assumes—but in no way finds—that there is a reasonably conceivable basis for the Court to infer that the statements at issue in this litigation were false.

[97] Am. Compl. ¶ 129.

books and records," that certain allegations were false.[98] Similarly, in paragraph 182 of the Amended Complaint, Plaintiffs allege that "the Defendants knew, based on their review of the Company's internal documents, that their representations were false" or made with reckless disregard for their truth.[99] Neither of these allegations make it reasonably conceivable that Coleman made the allegedly defamatory statements at issue with knowledge of their falsity or with reckless disregard for their truth. Plaintiffs point to no information contained in the "Company's books and records" or "internal documents" making it reasonably conceivable that Coleman acted with actual malice.

Plaintiffs finally argue that Coleman "acted in reckless disregard for the truth by making statements based on" the Background Investigation summary, "which was incomplete, inaccurate, and the result of a less than thorough effort."[100] But Plaintiffs do not adequately allege that the Background Investigation summary was false—they simply state that it "falsely suggested that O'Gara did not attend institutions that he in fact attended" without pleading facts indicating as much.[101] Such allegations are insufficient to demonstrate a reasonably conceivable basis for the Court to infer falsity.

---

[98] *Id.* ¶ 137.

[99] *Id.* ¶ 182.

[100] Pls.' Answering Br. at 54 (citing Am. Compl. ¶ 76).

[101] Am. Compl. ¶ 76.

## B.     The Court Lacks Personal Jurisdiction Over Green Lantern.

Green Lantern moves to dismiss the Amended Complaint under Rule 12(b)(2). "When a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[102]  In ruling on a 12(b)(2) motion, this Court may "consider the pleadings, affidavits and any discovery of record."[103]  "If, as here, no evidentiary hearing has been held, plaintiffs need only make a *prima facie* showing of personal jurisdiction and 'the record is construed in the light most favorable to the plaintiff.'"[104]

Delaware courts resolve questions of jurisdiction using a two-step analysis.[105] First, the court must "determine that service of process is authorized by statute."[106] Second, the defendant must have certain minimum contacts with Delaware such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice."[107]  To establish contacts sufficient to support long-arm

---

[102] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007) (citing *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318 (Del. Ch. 2003)).

[103] *Id.* (citing *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *3 (Del. Ch. Mar. 31, 2003)).

[104] *Id.* (first citing *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996) and then quoting *Cornerstone Techs.*, 2003 WL 1787959, at *3).

[105] *Id.*

[106] *Id.*

[107] *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

jurisdiction and satisfy due process, Plaintiffs invoke the conspiracy theory of jurisdiction established in *Istituto Bancario SpA v. Hunter Engineering Co.*[108]

Under the conspiracy theory of jurisdiction, "acts of each co-conspirator are attributable to each of the other co-conspirators."[109] "[I]f the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court."[110] Because certain applications of the conspiracy theory of jurisdiction "ha[ve] been criticized as leading to unconstitutional results,"[111] it is "narrowly and strictly construed."[112]

---

[108] 449 A.2d 210, 225 (Del. 1982) ("[A] conspirator who is absent from the forum state is subject to the jurisdiction of the court . . . if the plaintiff can make a factual showing that (1) a [tortious conspiracy[108]] existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy."); *Perry v. Neupert*, 2019 WL 719000, at *22 & n.178 (Del. Ch. Feb. 15, 2019) (observing that the *Istituto Bancario* test "functionally encompass[es] both the statutory and constitutional prongs of the test for personal jurisdiction." (collecting cases)).

[109] *Istituto Bancario*, 449 A.2d at 222.

[110] *Id.*

[111] *Hercules Inc. v. Leu Tr. and Banking (Bahamas) Ltd.*, 611 A.2d 476, 482 n.6 (Del. 1992).

[112] *Reid v. Siniscalchi*, 2018 WL 620475, at *14 (Del. Ch. Jan. 30, 2018) (quoting *Computer People, Inc. v. Best Int'l Gp., Inc.*, 1999 WL 288119, at *6 (Del. Ch. Apr. 27, 1999)).

To establish jurisdiction under the conspiracy theory of jurisdiction, a plaintiff must plead facts demonstrating the existence of a conspiracy.[113]  As discussed above, the Amended Complaint fails in this regard as to Coleman.  Because Plaintiffs rely on Coleman's actions to involve Green Lantern in the alleged conspiracy, Plaintiffs' failure to plead a conspiracy involving Coleman defeats Plaintiffs' ability to establish jurisdiction over Green Lantern under the conspiracy theory.  Even if the Amended Complaint adequately alleged a conspiracy involving Coleman, the Amended Complaint fails to support the existence of a civil conspiracy involving Green Lantern given the scant allegations specific to Green Lantern.[114]

There is also no basis to order jurisdictional discovery.  Plaintiffs have failed to demonstrate a sufficient basis for this Court to order jurisdictional discovery.  "Before ordering personal jurisdiction discovery there must be at least 'some

---

[113] *Konstantino v. Angioscore, Inc.*, 2015 WL 5770582, at *7 (Del. Ch. Oct. 2, 2015) (stating that the existence of a tortious conspiracy under the *Istituto Bancario* framework "is tested by reference to an additional five elements: '(1) two or more persons; (2) some object to be accomplished; (3) a meeting of the minds between or among such persons relating to the object or a course of action; (4) one or more unlawful acts; and (5) resulting proximate damages.'" (quoting *Hartsel v. Vanguard Gp., Inc.*, 2011 WL 2421003, at *10 (Del. Ch. June 15, 2011)).

[114] Plaintiffs' sole allegation specific to Green Lantern is that Coleman sent the September 12 Letter and September 15 Email in part in his capacity as a stockholder of Wanu and thus on behalf of Green Lantern.  Am. Compl. ¶ 128.  Communicating as a stockholder in this manner is insufficient to state a claim that Green Lantern participated in any tortious conspiracy.  And Plaintiffs do not meaningfully attempt in briefing to link Green Lantern to the all of the actions taken by Coleman as a Board member.

indication that this particular defendant is amenable to suit in this forum.'"[115]  For the reasons discussed above, there is no such indication here.  Plaintiffs are not permitted to use jurisdictional discovery to "fish for a possible basis for this court's jurisdiction."[116]  The motion to dismiss Green Lantern pursuant to Rule 12(b)(2) is granted.

## III.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.

---

[115] *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 816 n.195 (Del. Ch. 2009) (quoting *Hansen v. Neumueller GbmH*, 163 F.R.D. 471, 475 (D. Del. 1995)).

[116] *Id.* (quoting *Hansen*, 163 F.R.D. at 475).